CITY OF DAYTON, Appellant,

v.

The STATE of Ohio, Appellee.

[Cite as Dayton v. State, 157 Ohio App.3d 736, 2004-Ohio-3141.]

Court of Appeals of Ohio,
Second District, Montgomery County.

No. 20120.

Decided June 18, 2004.

Patrick J. Bonfield, Director of Law, John J. Danish, Chief Trial Counsel, and John C. Musto, Assistant City Attorney, for appellant.

Jim Petro, Attorney General, Sharon A. Jennings and Holly J. Hunter, Assistant Attorneys General, for appellee.

Barry M. Byron and Stephen L. Byron; John Gotherman, for amicus curiae Ohio Municipal League.

Stanley A. Hirtle and Legal Aid Society of Dayton, for amicus curiae Edgemont Neighborhood Coalition, Inc.

Michael W. Deemer and Ohio State Legal Services Association, for amicus curiae Coalition on Homeless and Housing in Ohio.

John Winship Read, John J. Kulewicz and Elizabeth A. Fox, for amicus curiae American Financial Services Association.

---

BROGAN, Judge.

## I. Factual Background

{¶ 1} In July 2001, the city of Dayton passed Ordinance No. 29990–01, which prohibits predatory lending practices in Dayton, restricts the ability of predatory lenders to transact business with Dayton, and allows injured parties to bring civil actions to void or correct predatory loans. The ordinance was codified as Sections 112.40 through 112.44 of the Revised Code of General Ordinances of the City of Dayton ("R.C.G.O.").

{¶ 2} Subsequently, the Ohio General Assembly passed legislation on the same subject. Amended Substitute H.B. 386 enacted new sections of the Revised Code (R.C. 1349.25 to 1349.37) that basically incorporated the federal Home Ownership and Equity Protection Act of 1994 ("HOEPA"). HOEPA was enacted as an amendment to the Federal Truth in Lending Act, and requires creditors to make disclosures in connection with certain mortgages, known as "high-cost" loans. See Pub.L. No. 103–325, Title I, Sections 151–158, 108 Stat. 2190 (1994) (amending Sections 1601–1602, 1604, 1610, 1639–1641, and 1648, Title 15, U.S.Code); and *Terry v. Community Bank of N. Virginia* (W.D.Tenn.2003), 255 F.Supp.2d 811, 816.

{¶ 3} HOEPA was designed " 'to ensure that consumers understand the terms of such loans and are protected from high pressure sales tactics.  * * * [It] prohibits High Cost Mortgages from including certain terms such as prepayment penalties and balloon payments that have proven particularly problematic.' " *McIntosh v. Irwin Union Bank & Trust Co.* (D.Mass.2003), 215 F.R.D. 26, 29, quoting from S.Rep. No. 103–169, at 21.

{¶ 4} Ohio's Predatory Lending Act is contained in R.C. Chapter 1349 (Consumer Protection). R.C. 1349.25(D) defines loans covered under the act as those that (1) involve property located in Ohio, and (2) are considered "mortgages" under Section 152(a) of HOEPA, "15 U.S.C.A. 1602(aa), as amended, and the regulations adopted thereunder by the federal reserve board." Section 152(a) of HOEPA defines a "mortgage" as:

{¶ 5} "[A] consumer credit transaction that is secured by the consumer's principal dwelling, other than a residential mortgage transaction, a reverse mortgage transaction, or a transaction under an open end credit plan, if—

{¶ 6} "(A) the annual percentage rate at consummation of the transaction will exceed by more than 10 percentage points the yield on Treasury securities having comparable periods of maturity on the fifteenth day of the month immediately preceding the month in which the application for the extension of credit is received by the creditor; or

{¶ 7} "(B) the total points and fees payable by the consumer at or before closing will exceed the greater of—

{¶ 8} "(i) 8 percent of the total loan amount; or

{¶ 9} "(ii) $400." 1602(aa)(1), Title 15, U.S.Code.

{¶ 10} When the Ohio General Assembly passed its own predatory lending Act, it included various provisions explicitly aimed at municipalities and other political subdivisions. These provisions were codified as R.C. 1.63, which states:

{¶ 11} "(A) The state solely shall regulate the business of originating, granting, servicing, and collecting loans and other forms of credit in the state and the manner in which any such business is conducted, and this regulation shall be in lieu of all other regulation of such activities by any municipal corporation or other political subdivision.

{¶ 12} "(B) Any ordinance, resolution, regulation, or other action by a municipal corporation or other political subdivision to regulate, directly or indirectly, the origination, granting, servicing, or collection of loans or other forms of credit constitutes a conflict with the Revised Code, including, but not limited to, Titles XI, XIII, XVII, and XLVII, and with the uniform operation throughout the state of lending and other credit provisions, and is preempted.

{¶ 13} "(C) Any ordinance, resolution, regulation, or other action by a municipal corporation or other political subdivision constitutes a conflict with the Revised Code, including, but not limited to, Titles XI, XIII, XVII, and XLVII, and is pre-empted, if the ordinance, resolution, regulation, or other action does either of the following:

{¶ 14} "(1) Disqualifies a person, or its subsidiaries or affiliates, from doing business with such municipal corporation or other political subdivision based upon the acts or practices of such person, or its subsidiaries or affiliates, as an originator, grantor, servicer, or collector of loans or other forms of credit;

{¶ 15} "(2) Imposes reporting requirements or other obligations upon a person, or its subsidiaries or affiliates, based upon such person's, or its subsidiaries' or affiliates', acts or practices as an originator, grantor, servicer, or collector of loans or other forms of credit."

{¶ 16} In addition, the uncodified law accompanying R.C. 1.63 stresses:

{¶ 17} "(A) The enactment of section 1.63 of the Revised Code by this act is intended as a clarification of existing law and not as a substantive change in the law.

{¶ 18} "(B) The enactment of section 1.63 of the Revised Code by this act expresses the legislative intent of the General Assembly currently and at the time of the original enactment of the provisions of the Revised Code, including, but not limited to, Titles XI, XIII, XVII, and XLVII, relating to the origination, granting, servicing, and collection of loans and other forms of credit." H.B. 386, Sections 3 and 4.

{¶ 19} Ohio's Predatory Lending Act was effective on May 24, 2002. Several days later, Dayton filed the present action for declaratory and injunctive relief. Dayton did not object to the Act's general content; instead, Dayton challenged only R.C. 1.63. Specifically, Dayton claimed that the preemption provisions in R.C. 1.63 violated Section 3, Article XVIII of the Ohio Constitution (Home Rule Powers). Dayton also alleged that the uncodified law accompanying R.C. 1.63 abused judicial authority in violation of Section 1, Article IV of the Ohio Constitution.

{¶ 20} After filing an answer, the state of Ohio filed a motion for judgment on the pleadings. Dayton then responded with a motion for summary judgment. Ultimately, the trial court found in Ohio's favor, granted Ohio's motion for judgment on the pleadings, and held Dayton's summary judgment motion moot. In particular, the court concluded that Dayton's ordinance conflicted with H.B. 386, that Dayton's ordinance was not purely a matter of self-government, and that H.B. 386 was a general law. The court did comment in its decision that R.C. 1.63(A), (B), (C)(1), and (C)(2) were unconstitutional because these provisions prevented Dayton from enacting any type of legislation on predatory lending. However, because judgment on the pleadings was granted in Ohio's favor, this finding was not reflected in the court's judgment. Due to the confusion over the effect of the trial court's ruling, both Dayton and Ohio have appealed.

{¶ 21} On appeal, Dayton raises the following assignments of error:

{¶ 22} "I. The trial court erred as a matter of law by failing to grant declaratory judgment on behalf of the City of Dayton.

{¶ 23} "II. The trial court erred as a matter of law by granting judgment on the pleadings to the State of Ohio."

{¶ 24} As cross-appellee, the state claims in a single assignment of error that "the trial court erred as a matter of law by finding R.C. 1.63 unconstitutional."

{¶ 25} Various organizations requested, and have been given, leave to file amicus curiae briefs. The amici curiae on behalf of Dayton, include Ohio Municipal League, Edgemont Neighborhood Coalition ("Edgemont"), and Coali-

tion on Homelessness and Housing in Ohio ("COHHIO"). In addition, American Financial Services Association has filed a brief supporting Ohio's position. We appreciate the effort of all to clarify this complex area of the law.

{¶ 26} After reviewing the record and applicable law, we find the assignments of error and the cross-assignment of error without merit. Accordingly, the judgment of the trial court will be affirmed. An explanation of our decision follows.

### First Assignment of Error

{¶ 27} As a preliminary matter, we note that judgments on the pleadings are reviewed de novo, which means that we independently decide whether the trial court judgment was proper as a matter of law. *Snyder v. Fairborn* (July 12, 2002), Greene App. No. 2001 CA 107, 2002 WL 1483282, * 5. Because motions for judgment on the pleadings are characterized as belated motions to dismiss, trial courts apply the standard used in evaluating motions to dismiss for failure to state a claim upon which relief can be granted. *Terry v. Ottawa Cty. Bd. of Mental Retardation & Dev. Disabilities,* 151 Ohio App.3d 234, 2002-Ohio-7299, 783 N.E.2d 959, at ¶ 8. Thus, "[w]hen considering a defendant's Civ. R. 12(C) motion for judgment on the pleadings, the trial court is required to construe as true all the material allegations in the complaint, with all reasonable inferences to be drawn therefrom, in favor of the nonmoving party." *Whaley v. Franklin Cty. Bd. of Commrs.* (2001), 92 Ohio St.3d 574, 581, 752 N.E.2d 267.

{¶ 28} The allegations in the complaint basically mirror the facts we outlined above. In the first assignment of error, Dayton claims that the trial court erred by failing to grant declaratory judgment in Dayton's favor. In this regard, Dayton focuses on four main points: (1) that R.C. 1.63 and H.B. 386, Sections 3 and 4, are unconstitutional because they purport to expressly preempt municipal legislation; (2) that R.C. 1.63(C)(1) unlawfully interferes with municipal powers of local self-government; (3) that R.C. 1.63 and H.B. 386, Sections 3 and 4, are not general laws; and (4) that R.C. 1.63 and H.B. 386, Sections 3 and 4, violate the separation-of-powers doctrine. We will address these matters separately, as well as other pertinent concepts of municipal law.

### A.   Analysis of Local Self–Government

{¶ 29} Under Section 3, Article XVIII of the Ohio Constitution, or the Home Rule provision, "[m]unicipalities shall have authority to exercise all powers of local self-government and to adopt and enforce within their limits such local police, sanitary and other similar regulations, as are not in conflict with general laws." In *Rispo Realty & Dev. Co. v. Parma* (1990), 55 Ohio St.3d 101, 564 N.E.2d 425, the Ohio Supreme Court noted that " '[t]he words, "as are not in

conflict with general laws" * * * modify the words "local police, sanitary and other similar regulations" but do not modify the words "powers of local self-government" ' " Id. at 103, 564 N.E.2d 425, quoting *State ex rel. Canada v. Phillips* (1958), 168 Ohio St. 191, 5 O.O.2d 481, 151 N.E.2d 722, paragraph four of the syllabus. The Ohio Supreme Court has also stressed:

{¶ 30} "A state statute takes precedence over a local ordinance when (1) the ordinance is in conflict with the statute, (2) the ordinance is an exercise of the police power, rather than of local self-government, and (3) the statute is a general law." *Canton v. State*, 95 Ohio St.3d 149, 2002-Ohio-2005, 766 N.E.2d 963, at ¶ 9.

{¶ 31} "The first step * * * in a proper home-rule analysis is to decide whether the matter in question involves an exercise of local self-government or an exercise of local police power." *Twinsburg v. State Emp. Relations Bd.* (1988), 39 Ohio St.3d 226, 228, 530 N.E.2d 26, overruled on other grounds in *Rocky River v. State Emp. Relations Bd.* (1989), 43 Ohio St.3d 1, 20, 539 N.E.2d 103. A power of local self-government includes " 'such powers of government as, in view of their nature and the field of their operation, are local and municipal in character.' " *Billings v. Cleveland RR. Co.* (1915), 92 Ohio St. 478, 484, 111 N.E. 155. For example, municipal elections are matters of local concern, and municipalities are free to adopt a system of electing officials different from that provided by law, as long as constitutional requirements are not violated. *State ex rel. Toledo v. Lucas Cty. Bd. of Elections* (2002), 95 Ohio St.3d 73, 76–77, 765 N.E.2d 854. Similarly, municipal ordinances on military leave for employees are matters of local interest and prevail over conflicting state law. See, e.g., *State ex rel. Fraternal Order of Police, Ohio Labor Council, Inc. v. Sidney* (2001), 91 Ohio St.3d 399, 402, 746 N.E.2d 597. After reviewing the allegations in the complaint and the pertinent statutes, we find that regulation of predatory lending is not a matter of local self-government. Instead, it governs conduct that is not just local or municipal in character, and involves the use of police powers. Accordingly, we will apply the standards governing a municipality's exercise of police powers.

### Preemption and the Statewide–Concern Doctrine

{¶ 32} Before we apply police power standards, however, we should address Dayton's first objection, which involves the issue of preemption. Dayton contends that the legislature cannot extinguish the power of Ohio municipalities to enact police regulations because municipal power is derived from Section 3, Article XVIII of the Ohio Constitution, not from a legislative grant. As support for this theory, Dayton relies on *Fondessy Enterprises, Inc. v. Oregon* (1986), 23 Ohio St.3d 213, 23 OBR 372, 492 N.E.2d 797. The trial court agreed with Dayton that the legislature could not expressly preempt municipal power, and found R.C. 1.63(A), (B), and (C) unconstitutional.

{¶ 33} In contrast, Ohio claims that the legislature has exclusive authority to regulate areas of "statewide concern." In this regard, Ohio focuses on cases like *Cleveland Elec. Illum. Co. v. Painesville* (1968), 15 Ohio St.2d 125, 44 O.O.2d 121, 239 N.E.2d 75, which allegedly held that regulation of electric utilities is a matter of statewide concern, preempting all local regulation.

{¶ 34} After reviewing the law in this area, we find a general lack of consistency in the decisions. For example, in *Weir v. Rimmelin* (1984), 15 Ohio St.3d 55, 15 OBR 151, 472 N.E.2d 341, the Ohio Supreme Court considered the issue of municipal regulation of outdoor advertising signs along interstate and primary highways. The court found that regulation of such signs was of "statewide concern" and a proper use of state police power. The court also concluded that because there was no evidence of state or federal legislative intent to "preempt" municipal regulation of outdoor signs, municipalities could "lawfully regulate outdoor advertising devices as a legitimate exercise of local self-government if such regulations do not conflict with a general state law." Id. at 56–57, 15 OBR 151, 472 N.E.2d 341. Implicit in this holding is the fact that municipalities are precluded from acting in an area if preemptive legislation exists.

{¶ 35} Likewise, *Clermont Environmental Reclamation Co. v. Wiederhold* (1982), 2 Ohio St.3d 44, 2 OBR 587, 442 N.E.2d 1278, invalidated a local zoning resolution that banned a preexisting hazardous waste facility. In this regard, the Ohio Supreme Court found that state legislation on the subject was a general law for carrying out statewide legislative goals, and political subdivisions were subject to its provisions, "notwithstanding" the Home Rule Amendment. Id. at paragraph two of the syllabus.

{¶ 36} A few years later, however, the Ohio Supreme Court decided *Fondessy Enterprises*, 23 Ohio St.3d 213, 23 OBR 372, 492 N.E.2d 797. In this case, the city of Oregon had passed an ordinance that imposed permit fees on hazardous landfills within the city and also required operators to keep various records and forms. Both lower courts found that the statute (the same one involved in *Clermont,* i.e., R.C. 3734.05[D][3] ) expressly preempted the city from enacting the ordinance. Id. at 215, 23 OBR 372, 492 N.E.2d 797.

{¶ 37} On appeal, the Ohio Supreme Court reiterated that hazardous waste disposal was of vital concern and was of public interest to Ohio citizens. The court also observed that the central issue in *Fondessy Enterprises* was the hazardous waste statute and the construction given to the statute by *Clermont.* Id. In this regard, the court found inconsistencies between paragraph two of the syllabus in *Clermont* and the court's holding in the case. Id., 23 Ohio St.3d at 216, 23 OBR 372, 492 N.E.2d 797. Specifically, the syllabus implied that the state legislation preempted municipal authority. However, the holding in the case

indicated that the state legislation would "take precedence over laws in conflict" with the statutes. Consequently, the Ohio Supreme Court clarified:

{¶ 38} "Taken together, paragraph two of the syllabus of *Clermont* and its holding should mean that no municipal ordinance may be enacted which conflicts with the state statute. * * *

{¶ 39} "If the provisions of * * * [the legislation in question] do preclude a home rule municipality, with police powers guaranteed it by the Ohio Constitution, from enacting any and all legislation, then that provision of state law must be ruled unconstitutional." Id., 23 Ohio St.3d at 216, 23 OBR 372, 492 N.E.2d 797.

{¶ 40} While this may have temporarily reconciled some conflict, the law continued to be inconsistent concerning various aspects of Home Rule law. See Vaubel, Municipal Home Rule in Ohio (1978), Chapter VII, Section 91, at 798 (indicating that lower courts have had difficulty applying Home Rule law because guidelines from higher authorities, i.e., the Ohio Supreme Court and the General Assembly, are unclear and inconsistent). To some extent the difficulty arises from imprecise use of language and concepts in the case law. According to Vaubel:

{¶ 41} "Although the proponents of the Home Rule Amendments intended to separate state and municipal authority by a clear line of division, they in fact created three segments of power; two were consistent with the intended division, while the third blurred the distinction through the recognition of shared power. First, *exclusive* state power was retained in those areas where a municipality would in no way be affected or where state dominance seemed to be required. * * * A second area of exclusive municipal power * * * was created by the Amendments insofar as local self-government power is exercisable * * * by charter municipalities * * * and to the extent that municipalities may acquire and operate public utilities or contract for their services. * * * Finally, a third area of mutual power was established involving the adoption of police regulations, with points of friction between enactments of the two levels of government subject to resolution by the 'no conflict' test * * *.

{¶ 42} "Given this division of power, there is no place for a fourth category. Therefore, the term 'statewide concern,' with the attendant stress that it places upon state authority, would as a matter of convenience rather than necessity best be used to describe those areas where state power is exclusive. It might also be used to describe the extent of state police power which was left unimpaired by the adoption of the Home Rule Amendments as well as to describe those areas of authority which are outside the outer limits of 'local' power, i.e., those matters which are neither 'local self-government' nor 'local police and sanitary regulations.'

{¶ 43} "If 'statewide concern' were given an additional meaning—one designating a fourth area of independent significance—it would require a withdrawal of municipal authority, not a contraction of state power. State power would therefore be defined with little or no heed paid to constitutional grants of authority to municipalities." (Footnotes omitted.) Vaubel, Section IX, at 1107–1108.

{¶ 44} Vaubel notes in his 1978 book on municipal law that Ohio courts have referred enough to "statewide concern" to suggest that some modification of the traditional three-part division of authority may be developing. Id. at 1108. In a later update, covering the years 1976 through 1995, Vaubel discusses further inconsistencies in the area and the lack of clear-cut limitations, but reaches no ultimate conclusions. See Vaubel, Municipal Home Rule in Ohio (1995), 22 Ohio N.U.L.Rev. 143, 212–224.

{¶ 45} Our review of the case law indicates that the term "statewide concern" was first mentioned in *Billings, supra*, in the context of distinguishing (for purposes of the preliminary analysis of local self-government power) between matters that are local and those that are of broader, i.e., statewide, concern. In this context, *Billings* noted:

{¶ 46} "The claim of the plaintiffs in this case is that the ownership and control of the streets for the purpose of travel [are] vested in the Legislature, as the representative of the people of the state. The contention substantially is that the control of the streets is not a matter of merely local concern, but is of statewide concern, and therefore not included within the power of local self-government." 92 Ohio St. 478, 485–486, 111 N.E. 155.

{¶ 47} Ultimately, the court decided in *Billings* that an ordinance granting the right to construct a railroad in the streets was a matter of local concern, prevailing over state statutes that required the filing of consents of abutting property owners prior to the granting of permission to erect railroads in the street. Id., 92 Ohio St. at 490–492, 111 N.E. 155. A similar approach was followed in *State ex rel. Strain v. Houston* (1941), 138 Ohio St. 203, 207, 20 O.O. 265, 34 N.E.2d 219, where the court considered, among other things, whether the state legislature could "enact a general law ' "fixing and regulating the hours of labor" ' of firemen employed by cities, and providing ' "for the comfort, health, safety and general welfare" ' of such firemen, or * * * [whether] such provisions [are] matters of local self-government, not subject to regulation or control by state legislation." Id. at 207, 20 O.O. 265, 34 N.E.2d 219. In this particular instance, the court decided that fire protection involved police powers, that the state statute was a general law, and that a conflicting municipal ordinance was invalid. Id. at 214–215, 20 O.O. 265, 34 N.E.2d 219. However, the court did not

speak in terms of "preemption"; instead, the analysis was based on conflicts between the state legislation and the municipal ordinance.

{¶ 48} In *Cincinnati v. Gamble* (1941), 138 Ohio St. 220, 20 O.O. 273, 34 N.E.2d 226, the Ohio Supreme Court held that "[i]n matters of state-wide concern the state is supreme over its municipalities and may in the exercise of its sovereignty impose duties and responsibilities upon them as arms or agencies of the state." Id. at paragraph three of the syllabus. *Gamble* involved a clash between a state retirement fund and one established by the city of Cincinnati for police and firemen. Id. at 224–225, 20 O.O. 273, 34 N.E.2d 226. The court did not discuss preemption, however, but focused instead on whether the ordinance in question conflicted with or was "contrary" to the state statute. Id. at 228, 20 O.O. 273, 34 N.E.2d 226. Accord *State ex rel. Arey v. Sherrill* (1944), 142 Ohio St. 574, 583–584, 27 O.O. 505, 53 N.E.2d 501 (local provisions allowing city manager to inquire into suspension of police department member conflict with and must yield to state statutes indicating that police and fire departments are governed by civil service system).

{¶ 49} Preemption is mentioned for the first time in connection with "statewide concern" in *Arey*, in a concurring opinion. Justice Williams acknowledged that preemption was not at issue in either *Arey* or *Gamble*. Nonetheless, Williams expressed the opinion that:

{¶ 50} "When the state acts in a matter affecting a municipality because it is a matter of statewide concern, the field is pre-empted or closed and the municipality can not act on the same matter as is possible in case of police, sanitary or similar regulations.

{¶ 51} "The doctrine of pre-emption was studiously avoided in *City of Cincinnati v. Gamble*, supra, because the question of a matter of state-wide concern becoming one regarding which the municipality could act, when the state did not, did not arise. Likewise the question is not directly made in the instant case. But when the validity of municipal legislation (other than regulations) is asserted to be based upon the fact that such legislation is not in conflict with general laws, the principles of pre-emption become an important matter of inquiry." Id., 142 Ohio St. at 589–590, 27 O.O. 505, 53 N.E.2d 501 (Williams, J., concurring).

{¶ 52} Subsequently, the Ohio Supreme Court overruled the pertinent parts of *Gamble* and *Arey*. See *State ex rel. Canada v. Phillips* (1958), 168 Ohio St. 191, 192, 5 O.O.2d 481, 151 N.E.2d 722, paragraph eight of the syllabus. *Canada* involved conflicting state and municipal provisions regarding appointment of persons who were certified after a civil service examination for positions above the rank of patrolman in a police department. Id. at 192–193, 5 O.O.2d 481, 151 N.E.2d 722. In discussing whether this was a matter of local self-government, the Ohio Supreme Court noted that it was confronted with two lines of decisions

that could not be reconciled on any reasonable basis. Id. at 199, 5 O.O.2d 481, 151 N.E.2d 722. The court then said, with regard to the *Gamble* line of cases:

{¶ 53} "[I]f the 'statewide concern' in 'matters relating to the members of a police department' is the basis for justifying having such matters controlled by the state, as the foregoing cited decisions from volumes 138 and 142 of our reports indicate, it would seem that there would be even more 'state-wide concern' to justify state control over selection of the head of the police department than there would be with respect to appointment of less important members of such police department. There is certainly no apparent language in the Constitution that can furnish any reasonable basis for preventing state interference with the appointment of the head of the department while allowing such interference with appointments of somewhat less important members thereof. Also, any such possible distinction would seem to be irreconcilable with the decision in *State ex rel. Arey v. Sherrill,* supra * * *.

{¶ 54} "It is undoubtedly true that the enforcement of laws by police in every part of the state is a matter of 'state-wide concern.' Undoubtedly the state has power to provide for police in every part of the state to enforce its laws. Actually, in providing for sheriffs, our state laws do provide for such police. However, where a municipality establishes and operates a police department, it may do so as an exercise of the powers of local self-government conferred upon it by Sections 3 and 7 of Article XVIII of the Constitution. If it does, the mere interest or concern of the state, which may justify the state in providing similar police protection, will not justify the state's interference with such exercise by a municipality of its powers of local self-government." Id., 168 Ohio St. at 199–200, 5 O.O.2d 481, 151 N.E.2d 722.

{¶ 55} Accordingly, the *Canada* court stated in paragraphs three and four of the syllabus:

{¶ 56} "The authority of the General Assembly, to enact laws applicable to cities pursuant to Section 10 of Article XV of the Constitution, is an authority to enact such laws to be applicable in cities only where and to the extent that such laws will not restrict the exercise by such cities of their powers of local self-government.

{¶ 57} "The words, 'as are not in conflict with general laws' found in Section 3 of Article XVIII of the Constitution, modify the words 'local police, sanitary and other similar regulations' but do not modify the words 'powers of local self-government.'" Id., 168 Ohio St. at 191, 5 O.O.2d 481, 151 N.E.2d 722.

{¶ 58} One would think this had settled some issues. However, just four years after *Canada,* the Ohio Supreme Court stated in the syllabus of *State ex rel. McElroy v. Akron* (1962), 173 Ohio St. 189, 19 O.O.2d 3, 181 N.E.2d 26:

{¶ 59} "The enactment of Section 1547.61, Revised Code, constitutes a valid exercise of the police power by the state, and by the enactment of such section the state has pre-empted the authority to license watercraft whether operated on public or private waters."

{¶ 60} In discussing whether boat licensing involved local self-government or was a matter of statewide concern, the court first identified various policy reasons why boating was a matter of statewide concern. Id., 173 Ohio St. at 191–192, 19 O.O.2d 3, 181 N.E.2d 26. The court then concluded:

{¶ 61} "Where the use of property becomes statewide, local regulations in the nature of licensing in respect thereto are a harassment to the general public[;] accompanying this then is the need for a uniform standard of safety regulations, and such matters are the subject of statewide concern requiring uniform and general regulation by the state." Id., 173 Ohio St. at 193, 19 O.O.2d 3, 181 N.E.2d 26.

{¶ 62} Moreover, regarding Home Rule, the court commented that while the amendment "extends powers to municipalities as to matters which are purely of local concern, it does not invest exclusive powers in the municipalities, and the police power, by the terms of the Constitution, is limited to those regulations which do not conflict with the general law. Once a matter has become of such general interest that it is necessary to make it subject to statewide control so as to require uniform statewide regulation, the municipality can no longer legislate in the field so as to conflict with the state. It must be remembered that a city is an agency (some prefer stepchild) of the state. As we have indicated the use of boats for recreational purposes has so expanded that local licensing would place an undue burden and constitute an unwarranted harassment of those of the general public who wish to enjoy the recreation of boating and would oft times require the purchase of a season's license for a single use of a lake." Id., 173 Ohio St. at 194, 19 O.O.2d 3, 181 N.E.2d 26.

{¶ 63} The court then considered preemption. This was unnecessary, since the court could have simply found that the municipal requirement of a separate boat license conflicted with the state licensing scheme. In this regard, the court decided that the municipal requirement of a license was not a regulatory act but was instead an "excise tax."

{¶ 64} Consequently, the court believed that municipal action was precluded because the state had entered the field. Id., 173 Ohio St. at 195, 19 O.O.2d 3, 181 N.E.2d 26, citing *Haefner v. Youngstown,* 147 Ohio St. 58, 33 O.O. 247, 68 N.E.2d 64. *Haefner,* in turn, was based on the fact that a municipality's taxing power may be limited under Section 13, Article XVIII, by "express statutory provision or by implication flowing from state legislation" that preempts the field. 147 Ohio St. 58, 33 O.O. 247, 68 N.E.2d 64, paragraph three of the syllabus.

{¶ 65} Subsequently, however, the Ohio Supreme Court overruled *Haefner* in part in *Cincinnati Bell Tel. Co. v. Cincinnati* (1998), 81 Ohio St.3d 599, 693 N.E.2d 212 (stating in the syllabus that "taxing authority of a municipality may be preempted or otherwise prohibited only by an express act of the General Assembly"). This would probably not have affected the result in *McElroy,* because the statute in that case expressly prohibited political subdivisions from charging license fees. 173 Ohio St. at 191, 19 O.O.2d 3, 181 N.E.2d 26. However, *Cincinnati Bell* does represent a recent narrowing of state authority by the Ohio Supreme Court, and a return to more traditional notions of the equal dignity of state and municipal power. In this context, the court noted in *Cincinnati Bell*:

{¶ 66} "Pursuant to Section 13, Article XVIII, and Section 6, Article XIII, the Constitution confers power upon the General Assembly to limit the exercise of taxing power by a municipality. These provisions should be interpreted coextensively with the general grant of local governing authority to municipalities under Article XVIII. By the grant of this authority, the intention of the Home Rule Amendment was to eliminate statutory control over municipalities by the General Assembly. * * * Its passage granted ' "municipalities sovereignty in matters of local self-government, *limited only by other constitutional provisions*." ' " (Emphasis added by Ohio Supreme Court.) 81 Ohio St.3d at 605, 693 N.E.2d 212, quoting from *Canton v. Whitman* (1975), 44 Ohio St.2d 62, 65, 73 O.O.2d 285, 337 N.E.2d 766.

{¶ 67} The above language directly contrasts with the court's remarks in earlier cases. For example, the court commented in the case of *In re Decertification of Eastlake* (1981), 66 Ohio St.2d 363, 20 O.O.3d 327, 422 N.E.2d 598:

{¶ 68} "As expressed in R.C. Chapters 3781 and 3791, the state has manifested a statewide concern for uniformity in building industrialized units. When the state by comprehensive statutory plan has imposed regulations statewide where there is a genuine statewide concern for uniformity in building industrialized units, any ordinance which differs from the statutes by imposing more restrictive requirements is 'in conflict' therewith and is ipso facto invalid." Id., 66 Ohio St.2d at 369, 20 O.O.3d 327, 422 N.E.2d 598.

{¶ 69} The dissent in *Eastlake* pointed out that this was a misapplication of the law. In addition, the dissent noted that the cases the majority relied on did not say that more restrictive requirements imposed by ordinances would be invalid if statutes legislated over the same matter. Instead, ordinances were traditionally invalidated only if a "head-on collision" occurred. Id., 66 Ohio St.3d at 371, 20 O.O.3d 327, 422 N.E.2d 598 (Locher, J., dissenting).

{¶ 70} In *State ex rel. Evans v. Moore* (1982), 69 Ohio St.2d 88, 23 O.O.3d 145, 431 N.E.2d 311, the Ohio Supreme Court cited both *Eastlake* and *Cleveland Elec. Illum. Co. v. Painesville*, 15 Ohio St.2d 125, 44 O.O.2d 121, 239 N.E.2d 75, for the

"fundamental principle of Ohio law that, pursuant to the 'statewide concern' doctrine, a municipality may not, in the regulation of local matters, infringe on matters of general and statewide concern." Id. at 89–90, 23 O.O.3d 145, 431 N.E.2d 311. Accordingly, the court held in *Moore* that a state prevailing wage law "preempts and supersedes any local ordinance to the contrary." Id. at 91, 23 O.O.3d 145, 431 N.E.2d 311. Again, however, the court did not need to resort to such a doctrine, because the ordinance in question clearly conflicted with the state statute. Specifically, the prevailing wage law was a general law providing a uniform framework for workers' rights and remedies, and outlining civil and criminal sanctions for its violation. 69 Ohio St.2d at 91, 23 O.O.3d 145, 431 N.E.2d 311. The municipal ordinance directly conflicted by exempting the city and its contracts from the prevailing wage law. Id. at 88, 23 O.O.3d 145, 431 N.E.2d 311.

{¶ 71} Furthermore, in commenting that the state statute "preempts and supersedes any local ordinance to the contrary," the court departed from traditional analysis, which indicates that municipal ordinances will "yield" to state statutes, or be held "invalid," when conflict occurs. *Houston*, 138 Ohio St. at 214–215, 20 O.O. 265, 34 N.E.2d 219 (ordinance "invalid"); *Gamble*, 138 Ohio St. 220, 228, 20 O.O. 273, 34 N.E.2d 226 (city may not take action "contrary" to statute); and *Arey*, 142 Ohio St. at 583–584, 27 O.O. 505, 53 N.E.2d 501 (municipal ordinance "yields" to state statute).

{¶ 72} As we mentioned earlier, the Ohio Supreme Court impliedly referred to preemption in *Clermont*, in 1982, but later retracted that in *Fondessy Enterprises*, in 1986. Compare *Clermont*, 2 Ohio St.3d 44, 2 OBR 587, 442 N.E.2d 1278, at paragraph two of the syllabus, with *Fondessy Enterprises*, 23 Ohio St.3d at 216, 23 OBR 372, 492 N.E.2d 797. Thus, *Fondessy Enterprises* held that a state law would be unconstitutional if it precluded a municipality from enacting any and all legislation. 23 Ohio St.3d at 216, 23 OBR 372, 492 N.E.2d 797. In addition, the Ohio Supreme Court subsequently returned to the approach taken in *Billings*, i.e., that "statewide concern" is relevant in the context of deciding whether a particular matter falls within the ambit of local self-government or is a matter of statewide concern, so that it is not included within the power of local self-government. *Billings*, 92 Ohio St. at 485–486, 111 N.E. 155; State *Personnel Bd. of Review v. Bay Village Civ. Serv. Comm.* (1986), 28 Ohio St.3d 214, 216–217, 28 OBR 298, 503 N.E.2d 518; *Fenton v. Enharo* (1987), 31 Ohio St.3d 69, 70–71, 31 OBR 183, 509 N.E.2d 67; and *Ohio Assn. of Pub. School Emp., Chapter No. 471 v. Twinsburg* (1988), 36 Ohio St.3d 180, 183, 522 N.E.2d 532.

{¶ 73} The Ohio Supreme Court has not discussed or specifically addressed "statewide concern" since the late 1980s. In addition, the court has continued to cite and apply *Fondessy Enterprises*. For example, in *Sheffield v. Rowland*

(1999), 87 Ohio St.3d 9, 716 N.E.2d 1121, the village of Sheffield filed a declaratory judgment action against a proposed demolition debris facility, alleging that the facility violated village ordinances, even though the facility complied with the rules and standards in R.C. Chapter 3714. 87 Ohio St.3d at 10–11, 716 N.E.2d 1121.

{¶ 74} The trial court held that state law preempted the village ordinances, and the court of appeals affirmed. Id., 87 Ohio St.3d at 10, 716 N.E.2d 1121. However, on further appeal, the Ohio Supreme Court did not mention preemption. Instead, the court stated that the issue was "whether Sections 660.19 and 1155.05 of the Sheffield Village Codified Ordinances are *in conflict with* R.C. Chapter 3714." (Emphasis added.) Id. The court then applied traditional standards for deciding conflicts. In this regard, the court noted:

{¶ 75} "The test to determine when a conflict exists between a municipal ordinance and a general law of the state is 'whether the ordinance permits or licenses that which the statute forbids and prohibits, and vice versa.' " Id., 87 Ohio St.3d at 11, 716 N.E.2d 1121, quoting *Struthers v. Sokol* (1923), 108 Ohio St. 263, 140 N.E. 519, paragraph two of the syllabus; and *Fondessy Enterprises*, 23 Ohio St.3d 213, 23 OBR 372, 492 N.E.2d 797, paragraph two of the syllabus.

{¶ 76} In view of the continually "shifting sands" of legal authority in this area, we see no purpose in applying a separate doctrine of "statewide concern." Instead, we feel this concept is more pertinent to deciding, as a preliminary matter, whether a particular issue is "not a matter of merely local concern, but is of statewide concern, and therefore not included within the power of local self-government." *Billings*, 92 Ohio St. at 485–486, 111 N.E. 155.

### Preemption and Conflict Analysis

{¶ 77} Having rejected the application of statewide concern as a separate concept, we must next consider whether the state can expressly preempt the city from enacting any and all ordinances or regulations in the area of predatory lending. See R.C. 1.63(A) and (B). This area, again, is the subject of inconsistent decisions, and both parties have cited authority supporting their position. Compare *McElroy*, 173 Ohio St. 189, 19 O.O.2d 3, 181 N.E.2d 26; *Eastlake*, 66 Ohio St.2d 363, 20 O.O.3d 327, 422 N.E.2d 598; *Clermont*, 2 Ohio St.3d 44, 2 OBR 587, 442 N.E.2d 1278; and *Ohio Assn. of Private Detective Agencies* (1992), 65 Ohio St.3d 242, 602 N.E.2d 1147, with *W. Jefferson v. Robinson* (1965), 1 Ohio St.2d 113, 30 O.O.2d 474, 205 N.E.2d 382; and *Fondessy Enterprises*, 23 Ohio St.3d 213, 23 OBR 372, 492 N.E.2d 797. We have already discussed many of the inconsistencies among these decisions.

{¶ 78} For example, in *Eastlake*, the court stated that ordinances differing from a state comprehensive regulatory plan by imposing more restrictive require-

ments are "ipso facto invalid." However, the court said in *West Jefferson* that if a state statute "provided for a complete prohibition upon municipal regulation," "[m]anifestly such a law would not be effective to take away the power conferred upon municipalities by the plain provisions of the Constitution." 1 Ohio St.2d at 117, 30 O.O.2d 474, 205 N.E.2d 382.

{¶ 79} To some extent, inconsistencies can be reconciled by looking at what courts actually do, as opposed to what they say. For example, in *Ohio Assn. of Private Detective Agencies,* the dissent objected to invalidating the municipal ordinance because it felt the state law was not a general law, but was simply an impermissible attempt to limit municipal power. 65 Ohio St.3d at 246–249, 602 N.E.2d 1147 (Wright, J., dissenting). However, the majority opinion in the case actually applied a conflict analysis. Id. at 244–246, 602 N.E.2d 1147.

{¶ 80} Moreover, in *Fondessy Enterprises,* the Ohio Supreme Court clarified its prior decision in *Clermont.* Specifically, the court stated that a conflict analysis should be applied because elevating the state statute to a level of "express preemption" would mean that "no police power ordinance * * * would survive long enough to face a conflict test against a state statute." *Fondessy Enterprises,* 23 Ohio St.3d at 216, 23 OBR 372, 492 N.E.2d 797.

{¶ 81} Trying to further decipher and untangle the morass of conflicting opinions over the last century would be a completely unproductive task. In the absence of clarification from the Ohio Supreme Court, we will follow the approach outlined in *Fondessy Enterprises.* Thus, instead of applying preemption, we will use a conflict analysis. We note that the Eighth District has also interpreted *Fondessy Enterprises* in this manner and has chosen to focus on conflict, rather than preemption. See *Fairview Park v. Barefoot Grass Lawn Serv., Inc.* (1996), 115 Ohio App.3d 306, 311–312, 685 N.E.2d 300. We think this is the approach the trial court tried to follow, in holding R.C. 1.63(A) and (B) unconstitutional, while still invalidating Dayton's ordinance as being in conflict with Ohio's Predatory Lending Law. To some extent, this requires a strained interpretation of the statutes, which use terms like "preempt," but it is the only way the inconsistencies can be reconciled.

### Application of Conflict Analysis

### Exercise of Police Powers and General Laws

{¶ 82} As we mentioned earlier, the Ohio Supreme Court has outlined the following approach to deciding alleged conflicts between state and local ordinances. According to the court:

{¶ 83} "A state statute takes precedence over a local ordinance when (1) the ordinance is in conflict with the statute, (2) the ordinance is an exercise of the

police power, rather than of local self-government, and (3) the statute is a general law." *Canton,* 95 Ohio St.3d 149, 2002-Ohio-2005, 766 N.E.2d 963, at ¶ 9.

{¶ 84} We have already decided that Dayton's ordinance involves an exercise of police power, not pure local government. Likewise, we believe that the predatory lending statutes are general laws, as that term has been defined by the Ohio Supreme Court. In *Canton,* the court stated that for a state statute to be considered a "general law" for purposes of home rule analysis, the statute must "(1) be part of a statewide and comprehensive legislative enactment, (2) apply to all parts of the state alike and operate uniformly throughout the state, (3) set forth police, sanitary, or similar regulations, rather than purport only to grant or limit legislative power of a municipal corporation to set forth police, sanitary, or similar regulations, and (4) prescribe a rule of conduct upon citizens generally." 95 Ohio St.3d 149, 2002-Ohio-2005, 766 N.E.2d 963, at syllabus.

{¶ 85} Dayton makes several points regarding this test.

{¶ 86} First, Dayton claims that R.C. 1.63(A), (B), and (C)(1) and (2) and H.B. 386, Sections 3 and 4, merely serve to limit Dayton's legislative power. As a result, Dayton believes that these provisions do not qualify as statewide and comprehensive legislation and do not set forth police, sanitary, or other similar regulations. However, we disagree. Although R.C. 1.63(A), (B), and (C) do attempt to restrict municipal power, they must be read in the context of the overall legislation. In *Clermont,* the Ohio Supreme Court stressed that challenged statutory provisions "should not be read and interpreted in isolation" from other pertinent parts of the Ohio Revised Code. 2 Ohio St.3d at 48, 2 OBR 587, 442 N.E.2d 1278. Although *Clermont* was clarified in *Fondessy Enterprises,* this particular holding was not modified. The Ohio Supreme Court also followed this approach in *Canton.* See 95 Ohio St.3d 149, 2002-Ohio-2005, 766 N.E.2d 963, at ¶ 17 and 21–22.

{¶ 87} As we noted earlier, R.C. 1.63(A), (B), and (C) were part of Amended Substitute H.B. 386. This bill also enacted new sections of the Revised Code (R.C. 1349.25 to 1349.37), incorporating (with some exceptions) HOEPA, which is the federal Predatory Lending Act. Both R.C. 1.63(A), (B), and (C), and Ohio's Predatory Lending Act (R.C. 1349.25 through 1349.37) relate to the offering and provision of consumer mortgage credit. Compare R.C. 1349.25(D) ("covered loan" means a consumer credit mortgage loan transaction meeting certain criteria) and R.C. 1.63(A) ("the state solely shall regulate originating, granting, servicing, and collecting loans and other forms of credit"). Because these statutes were part of the same legislation and relate to the same subject matter, they should be read together, even though they are codified at different parts of the Ohio Revised Code. The first requirement under *Canton* is that the statute is "part of a statewide and comprehensive legislative enactment." 95 Ohio St.3d

149, 2002-Ohio-2005, 766 N.E.2d 963, at syllabus. Dayton does not address this point in detail, but COHHIO and Edgemont both contend that Ohio's Predatory Lending Act is not comprehensive because it lacks effective private consumer remedies and contains "gaping" loopholes. For example, consumers must rely on the state superintendent of financial institutions for enforcement. Consumers also have only a private remedy of rescinding the contract. See R.C. 1349.34 and 1349.29. COHHIO and Edgemont claim that rescission is ineffective because sub-prime-rate borrowers are generally at financial risk even before a transaction begins and would not be in a position to refund the contract proceeds. This would be particularly true of elderly consumers, who frequently fall victim to unsavory schemes in which contractors talk them into expensive home repairs, arrange for predatory loans, and then disappear with the money, having performed shoddy or incomplete work.

{¶ 88} An example of a loophole is the fact, for example, that a creditor may replace a zero interest loan made by a government agency with a high cost loan if the borrower consents in writing. See R.C. 1349.27(J). According to COHHIO, such paperwork can easily be slipped into a voluminous set of loan documents. Additionally, Ohio's Predatory Lending Act fails to regulate loans of up to 7.999 percent over the prime rate, meaning that creditors can still impose significant interest rates on unsuspecting borrowers.

{¶ 89} Undoubtedly, more effective legislation could be written, but that is not the function of the courts. "Comprehensive" means "covering a matter under consideration, completely accounting for or comprehending all or virtually all pertinent considerations." Webster's Third New International. Dictionary (1981) at 467. Notably, "comprehensive" does not mean "perfect." The problem with courts' making judgments about the effectiveness of legislation is that perfect legislation is never written. If the drafters had used an interest rate of 7 percent over prime, the act would be subject to criticism because loans at 6.999 percent over prime escape liability. Even if actions for civil damages had been included, in addition to the rescission remedy, the Predatory Lending Act could be challenged because it failed to include an attorney-fee provision. A damages remedy is of little use if a party cannot afford to pay attorney or litigation fees. Again, legislatures, not courts, are in the best position to make these types of policy decisions.

{¶ 90} The second requirement for a general law is that the statute "apply to all parts of the state alike and operate uniformly throughout the state." *Canton*, 95 Ohio St.3d 149, 2002-Ohio-2005, 766 N.E.2d 963, at syllabus. In *Canton*, the court found that the statute did not meet this prong because it excepted suburban areas of the state, which had a chance to opt out of the law by incorporating

restrictive covenants in deeds. Id. at ¶ 29–30. In contrast, Ohio's Predatory Lending Act applies uniformly across the state.

{¶ 91} *Canton*'s third criterion is that the statute "set forth police, sanitary, or similar regulations, rather than purport only to grant or limit legislative power of a municipal corporation to set forth police, sanitary, or similar regulations." Id. at syllabus. We have already discussed this point, and have concluded that this matter involves the police power. We further find that when the statutes are read together, R.C. 1.63 and H.B. 386, Sections 3 and 4, do not solely grant or limit legislative power.

{¶ 92} The final requirement under Canton is that the statutes "prescribe a rule of conduct upon citizens generally." 95 Ohio St.3d 149, 2002-Ohio-2005, 766 N.E.2d 963, at syllabus. No one has seriously contested this point, and we find that the matter satisfies the final criterion for a "general law."

Does Dayton's Ordinance Conflict with State Law?

{¶ 93} Having concluded that this matter is not purely a local self-government issue and that a general law is involved, we next consider whether the Dayton ordinance conflicts with the state statutes. 95 Ohio St.3d 149, 2002-Ohio-2005, 766 N.E.2d 963, at ¶ 9. Dayton does not address this point. Instead, Dayton takes the position that the constitutionality of Dayton's own ordinance was not properly before the trial court. In particular, Dayton relies on the fact that the complaint challenged only the content of R.C. 1.63 and Sections 3 and 4 of H.B. 386, and that the state failed to file counterclaims relating to city ordinances. Dayton also notes that the conflict issue and validity of Dayton's Predatory Lending Ordinance were before the Montgomery County Common Pleas Court in a previously filed action, which was stayed pending resolution of the present case. See *Am. Fin. Serv. Assn. v. Dayton* (July 12, 2002), Montgomery C.P. No. 03982 (granting stay of proceedings and denying consolidation). Accordingly, Dayton claims that the trial court erred in finding that the city ordinance conflicts with Ohio's Predatory Lending Act.

{¶ 94} Again, we disagree. Paragraphs 15 though 18 of the complaint specifically mention Dayton's Predatory Lending Ordinance (R.C.G.O. 112.40 through 112.44) and claim that H.B. 386 attempts to render the ordinance a nullity and invalidate the city's efforts to protect its citizens.

{¶ 95} In addition, the first and second claims for relief in the complaint allege that Dayton's ordinance is an exercise of local self-government. These claims for relief further allege that H.B. 386 impermissibly violates the Home Rule provisions of the Ohio Constitution by interfering with Dayton's local self-government, and by failing to be a "general law." Notably, these are the very issues the trial court addressed and that have been raised on appeal.

{¶ 96} Moreover, as we previously stressed, the challenged sections of H.B. 386 do not exist in a vacuum. They must be considered in conjunction with the rest of H.B. 386. And once that occurs, the applicable test requires that the state statute be compared with the local ordinance to see whether conflict exists. Accordingly, the trial court did not err in considering whether R.C.G.O. 112.40 though 112.44 conflict with Ohio's Predatory Lending Act.

{¶ 97} The primary complaint about Dayton's ordinance is that it imposes stricter requirements on lenders than Ohio's statutes do. For example, loans that would not be considered predatory under state law are covered by the ordinance. Specifically, R.C.G.O. 112.40(G) defines a "high-cost loan," in pertinent part, as one secured by residential real property within the City of Dayton, "if at any time over the life of the loan, the annual percentage rate of the loan equals or exceeds by more than nine (9%) percentage points * * * the yield on Treasury Securities having comparable periods of maturity to the loan maturity." In contrast, Ohio's law defines a "covered loan" as one that is considered a "mortgage" under HOEPA, i.e., it is a loan where the "annual percentage rate at consummation of the transaction will exceed by more than 10 percentage points the yield on Treasury securities having comparable periods of maturity." See R.C. 1349.25(D) and Section 152(a) of HOEPA, Section 1602(aa), Title 15, U.S.Code.

{¶ 98} Because Dayton's threshold percentage rate is lower, a loan passing muster under Ohio's statute would still be a "high cost" or predatory loan under the ordinance. In addition, Ohio's Act focuses on the annual percentage rate at consummation of the transaction, while Dayton's ordinance allows enforcement if the percentage rates fit within impermissible ranges at any time during the life of the loan.

{¶ 99} A further difference is that loans are covered under Ohio's Predatory Lending Act if the total points and fees payable at or before closing exceed the greater of 8 percent of the loan amount, or $400. Id. Dayton's threshold amount, again, is lower ("5% of the total loan amount or 6% of the loan amount if the total transaction amount is twenty thousand ($20,000) or more and the loan is a purchase money loan guaranteed by the Federal Housing Administration or Veterans Administration, whichever is less"). R.C.G.O. 112.40(G)(2).

{¶ 100} As an additional matter, the ordinance and statutes contain different provisions for loans involving balloon payments. For example, R.C.G.O. 112.40(L)(3) states that covered loans with balloon payments will be considered predatory loans unless they contain certain disclosures. In contrast, Ohio's predatory lending law allows balloon loans where the loan term is more than five years. Different disclosures are also required. See R.C. 1349.26 and 1349.27(C). Dayton's ordinance also classifies loans with mandatory arbitration clauses as

predatory, while Ohio's Predatory Lending Act does not include loans with such clauses. R.C.G.O. 112.40(L)(8).

{¶ 101} Unquestionably, the ordinance and statutes conflict. The issue, then, become whether the conflicts are permissible. Regrettably, like the other areas of municipal law that we investigated, the subject of "conflict" has spawned some inconsistent decisions. As Vaubel noted:

{¶ 102} "It seems apparent from constitutional debates that the proponents of Home Rule considered that their original proposal to grant Home Rule powers to municipalities included authority to municipalities to impose stricter regulations than those imposed by statute in order to meet their individual needs. Although the change in the wording of the police regulation grant in the convention may raise some doubts concerning the proper meaning to be ascribed to Section 3, Article XVIII, as finally adopted, the viewpoint that the grant of municipal power to impose stricter regulations remained intact.

{¶ 103} "Unfortunately, case law is not as clear on this point as might be desired." Vaubel, Municipal Home Rule in Ohio (1978), Chapter V, Section 62, at 692–693.

{¶ 104} For example, the Ohio Supreme Court adopted a "heads-on-collision" test in *Struthers v. Sokol* (1923), 108 Ohio St. 263, 140 N.E. 519. In this regard, the court said that, in deciding whether a municipal ordinance conflicts with a general state statute, "the test is whether the ordinance permits or licenses that which the statute forbids and prohibits, and vice versa." Id. at paragraph two of the syllabus. This is a fairly straightforward test.

{¶ 105} However, the court appears to have eroded the doctrine somewhat in a few later cases by using the concept of "conflict by implication." This has been described as a situation in which prohibiting one thing is considered the same as allowing what was not prohibited. See, e.g., *Neil House Hotel Co. v. Columbus* (1944), 144 Ohio St. 248, 253, 29 O.O. 403, 58 N.E.2d 665. See, also, *Lorain v. Tomasic* (1979), 59 Ohio St.2d 1, 4, 13 O.O.3d 1, 391 N.E.2d 726 (city ordinance forbidding payment of prize money in excess of $1,200 unconstitutionally conflicts with state law forbidding charities to pay out more than $3,500).

{¶ 106} On the other hand, even after the decision in *Neil House,* the Ohio Supreme Court has at times refused to apply conflict by implication. For example, in *Benjamin v. Columbus* (1957), 167 Ohio St. 103, 4 O.O.2d 113, 146 N.E.2d 854, the court rejected a claim that a local gambling ordinance conflicted with state statutes. In this regard, the court noted that to the extent the state statutes failed to prohibit the possession of the machines described in the ordinance, they "may be said to permit such possession or control. However, there is no statute or constitutional provision which authorizes the possession or

control of such machines. \* \* \* 'The ordinance merely goes further than the statute in prescribing a penalty for engaging in gambling transactions not covered by the statute. The ordinance is not inconsistent with the statute.' " Id. at 117–118, 4 O.O.2d 113, 146 N.E.2d 854. See, also, *Cleveland v. Raffa* (1968), 13 Ohio St.2d 112, 114, 42 O.O.2d 329, 235 N.E.2d 138 (disagreeing with contention that *Neil House* modified the test announced in *Struthers*).

{¶ 107} The Ohio Supreme Court has continued to cite and apply *Struthers* in varying situations without commenting on the inconsistency in some of its own decisions. See, e.g., *State v. Burnett* (2001), 93 Ohio St.3d 419, 431, 755 N.E.2d 857 (ordinance creating drug-exclusion zones); *Sheffield v. Rowland* (1999), 87 Ohio St.3d 9, 11, 716 N.E.2d 1121 (zoning ordinance prohibiting excavation); and *Middleburg Hts. v. Ohio Bd. of Bldg. Stds.* (1992), 65 Ohio St.3d 510, 512–513, 605 N.E.2d 66 (building standards). Rather than leap into the conundrum, and distinguish cases based on nearly intangible differences, we will apply the *Struthers* test in a straightforward manner. As a matter of common sense (something that should be welcome in the law but is sometimes absent), we believe that the conflicts are such that Dayton's ordinance must be invalidated.

{¶ 108} As an example, Ohio's Predatory Lending Act does not explicitly say that loans are permissible if their annual percentage rate at consummation of the transaction exceeds the yield on Treasury securities by less than 10 percent. Under "conflict by implication," a court would conclude that a conflict exists. Under a narrower construction, another court might find no conflict. Depending on what result a court might choose to reach, case law could be found to support the result.

{¶ 109} Nonetheless, no matter how broad or narrow the interpretation, we believe that the only reasonable inference to be drawn is that Ohio's Predatory Lending Act allows loans, i.e., does not consider loans to be "predatory," if their interest rate exceeds the yield on Treasury securities by less than 10 percent.

{¶ 110} In this regard, we focus on the fact that if the General Assembly had intended to include loans of a lesser percentage rate within the meaning of "covered loans" or "high-cost loans," it would have said so. Accordingly, we agree with the trial court that Dayton's ordinance impermissibly conflicts with state law on the same subject. We stress that this does not mean that Dayton is precluded from acting in the field; it simply means that any ordinance must be tailored in a way that it will not conflict with state legislation on the subject.

### R.C. 1.63(C)(1) and Local Self–Government

{¶ 111} As we mentioned, Dayton also claims in the first assignment of error that R.C. 1.63(C)(1) unlawfully interferes with municipal powers of local self-government. This section of the statute provides:

{¶ 112} "(C) Any ordinance, resolution, regulation, or other action by a municipal corporation or other political subdivision constitutes a conflict with the Revised Code, including, but not limited to, Titles XI, XIII, XVII, and XLVII, and is pre-empted, if the ordinance, resolution, regulation, or other action does either of the following:

{¶ 113} "(1) Disqualifies a person, or its subsidiaries or affiliates, from doing business with such municipal corporation or other political subdivision based upon the acts or practices of such person, or its subsidiaries or affiliates, as an originator, grantor, servicer, or collector of loans or other forms of credit."

{¶ 114} According to Dayton, this part of the statute adds "insult to injury" by eliminating the city's right to refuse to contract with predatory lenders who are destabilizing Dayton's neighborhoods. In contrast, the state contends that this simply prevents indirect enforcement of an ordinance that is otherwise impermissible. We agree with the state. As a contracting entity, Dayton certainly has the ability and right to choose those business entities with which it wishes to contract. However, Dayton does not need to pass an ordinance to that effect, particularly when the clear intent is to accomplish indirectly what cannot directly be done.

### Sections 3 and 4 of H.B. 386

{¶ 115} Dayton's final arguments in connection with the first assignment of error raise the claim that Sections 3 and 4 of H.B. 386 are not general laws and that they also violate the separation-of-powers doctrine. We have already discussed the need to read the entire Act together and will not further consider the "general law" issue.

{¶ 116} In Section 3 of H.B. 386, the General Assembly states, without expressly saying so, that H.B. 386 complies with legal requirements for finding that state statutes take precedence over conflicting local ordinances. For example, the General Assembly notes in Section 3 that the bill furthers the state's police powers and is also a "general law." And, in Section 4, the General Assembly states that R.C. 1.63 is being enacted to clarify, rather than to substantively change existing law. According to Dayton, these remarks violate the separation-of-powers doctrine under *State ex rel. Ohio Academy of Trial Lawyers v. Sheward* (1999), 86 Ohio St.3d 451, 715 N.E.2d 1062.

{¶ 117} The Ohio Supreme Court stressed in *Sheward* that "[t]he power and duty of the judiciary to determine the constitutionality and, therefore, the validity of the acts of the other branches of government have been firmly established as an essential feature of the Ohio system of separation of powers. * * * However, this was not always so, and a major part of our history involves a continuing effort to establish and secure this power as intrinsic to the judiciary and, indeed,

to establish the judiciary as a viable and coequal branch of our government." 86 Ohio St.3d at 462, 715 N.E.2d 1062.

{¶ 118} Because the General Assembly intruded upon the power of the courts, *Sheward* held Am. Sub. H.B. No. 350 (the Tort Reform Act) unconstitutional. In particular, the court noted that the Tort Reform Act "is no ordinary piece of legislation that happens to inadvertently cross the boundaries of legislative authority. The General Assembly has circumvented our mandates, while attempting to establish itself as the final arbiter of the validity of its own legislation. It has boldly seized the power of constitutional adjudication, appropriated the authority to establish rules of court and overrule judicial declarations of unconstitutionality, and, under the thinly veiled guise of declaring 'public policy,' establishing 'jurisdiction,' and enacting 'substantive' law, forbade the courts the province of judicial review." Id., 86 Ohio St.3d at 492, 715 N.E.2d 1062.

{¶ 119} In the present case, the General Assembly's comments could be interpreted as an attempt to circumvent the authority of the courts. However, we prefer to read the comments in question as mere expressions of nonbinding opinion. Thus, this case differs from *Sheward*. As the majority in that case observed, there is a difference between the legislature's attempt to nullify court interpretations of the constitutionality of statutes and the legislature's expression of opinion as to constitutionality. Id., 86 Ohio St.3d at 506, 715 N.E.2d 1062. See, also, *Scancarello v. Erie Ins. Co.* (July 25, 1996), Franklin App. No. 96APE02–166, 1996 WL 421858, * 3 (commenting that under Ohio's "system of checks and balances, the judiciary retains the power to nullify legislative decisions if they violate a state or federal constitutional provision").

{¶ 120} Accordingly, we are not bound by the General Assembly's opinion about the legal effect of H.B. 386. To the contrary, courts decide whether a statute complies with legal requirements for being a "general law" or involves the exercise of police powers. By the same token, Sections 3 and 4 of H.B. 386 do not violate the separation-of-powers doctrine simply because the General Assembly took the opportunity to voice an opinion about the bill's legal effect.

{¶ 121} Because we have rejected all of Dayton's arguments, the first assignment of error is overruled. Notably, we have also rejected the state's argument as to ambiguity in the trial court's decision. As we said, the trial court appeared to be focusing on conflict rather than preemption. Therefore, while the court commented that R.C. 1.63(A) and (B) were unconstitutional, the court ultimately and properly invalidated Dayton's ordinance. Accordingly, the trial court's comments on unconstitutionality were of no consequence to the final judgment, and the state's cross-assignment of error is also overruled.

Second Assignment of Error

{¶ 122} In the second assignment of error, Dayton claims that the trial court erred as a matter of law by granting judgment on the pleadings to the state of Ohio.

{¶ 123} Dayton's first argument in this context is that the trial court erred in considering Dayton's Predatory Lending Ordinance. We have already rejected this argument, because the trial court could not evaluate the state statutes in a vacuum.

{¶ 124} Dayton's second contention is that the trial court erred by making improper factual findings when ruling on the state's motion for judgment on the pleadings. Specifically, in discussing whether Dayton's ordinance involved local self government powers or police powers, the trial court remarked:

{¶ 125} "While Plaintiffs argue that the predatory lending ordinance only affects members of the Dayton community, Defendants argue that if local predatory lending laws are upheld throughout the state the citizens of Ohio as a whole would be negatively affected. This court finds that the City of Dayton ordinance regulating predatory lending has effects that reach outside the municipality. The reason being that the Dayton ordinance will not hinder the overall lending of these predatory institutions that target low income families. Rather these lenders will simply expand their efforts to other communities. Due to the composition of the community Dayton is a prime target for predatory lenders. By prohibiting predatory lending in Dayton, extraterritorial cities and communities that do not have similar local legislation are affected in the sense that predatory lending would become more prevalent in these communities in an effort by these lending institutions to substitute clients not covered by the Dayton ordinance. If the lending institutions cannot solicit clients from Dayton they will turn to other communities."

{¶ 126} According to Dayton, the trial court's remarks were improper on a motion for judgment on the pleadings, were unsupported by the record, and were insulting to the people of the city of Dayton, by implying that they are less important than persons in surrounding counties. Again, we disagree.

{¶ 127} It is true that the complaint lacked allegations, for example, that Dayton's community composition offers a prime target for predatory lenders. Instead, facts supporting this point were outlined in the affidavit of City Commissioner Dean Lovelace, which was attached to Dayton's combined motion for summary judgment and response to the state's motion for judgment on the pleadings. In addition, the amicus curiae brief Edgemont filed in the trial court commented in detail about the problem of predatory lending in Dayton. The trial court can hardly be faulted for noticing the facts that were put before it, even

though judgments on the pleadings are to be based on the allegations of the complaint. *Whaley,* 92 Ohio St.3d at 581, 752 N.E.2d 267.

{¶ 128} Nonetheless, the trial court's error, if any, was harmless for two reasons. First, the court did not base its "police power" decision on the composition of Dayton's community or on other facts outside the record. Instead, the court simply observed that if Dayton outlawed predatory lending, unethical lenders would focus on other Ohio communities. Based on this observation, the court then found that Dayton's ordinance was not purely a matter of local self-government. These were not "factual" findings. Instead, they were conclusions derived from common sense. If a predatory lender cannot operate in a particular vicinity, common sense dictates that the lender will go elsewhere for its victims.

{¶ 129} The second reason any error is harmless is that we have independently concluded that Dayton's ordinance involves police powers, i.e., the ordinance regulates conduct that is not just local or municipal in nature. Since de novo review requires our independent analysis of the record and applicable law, the trial court's alleged improper focus does not require reversal. See, e.g., *Allstate Ins. Co. v. Cope,* Montgomery App. No. 20179, 2004-Ohio-2603, 2004 WL 1145840, at ¶ 12; and *Back v. Am. States Ins. Co.* (Nov. 1, 1995), Montgomery App. No. 15915, 1995 WL 643121, * 2 (holding that trial court's alleged failure to provide parties with its interpretation of an insurance policy would be harmless error, because the appellate court independently reviews policies, pursuant to its de novo review power).

{¶ 130} As a final matter, the trial court's remarks did not insult the people of Dayton. Predatory lending is a serious problem, for Dayton as well as other communities. However, uniform legislation is a better way to solve the problem than having many conflicting requirements at the state and local level. If the current predatory lending law needs stronger or more effective provisions, the legislature should address the problem, as a matter of public policy. And, as we stressed, Dayton is not precluded from acting, so long as conflict with state statutes can be avoided.

{¶ 131} In light of the preceding analysis, Dayton's first and second assignments of error are overruled, and the state's cross-assignment of error is also overruled. Accordingly, the judgment of the trial court is affirmed.

Judgment affirmed.

WOLFF and FREDERICK N. YOUNG, JJ., concur.