**AMERICAN FINANCIAL SERVICES ASSOCIATION et al., Appellees,**

v.

**CITY OF TOLEDO, Appellant.**

[Cite as *Am. Fin. Servs. Assn. v. Toledo*, 161 Ohio App.3d 477, 2005-Ohio-2943.]

Court of Appeals of Ohio,
Sixth District, Lucas County.

No. L–04–1214.

Decided June 10, 2005.

478

480

---

John Winship Read and John J. Kulewicz, for appellee American Financial Services Association.

Jim Petro, Attorney General, Sharon A. Jennings, and Holly J. Hunter, Assistant Attorneys General, for appellee state of Ohio.

Barbara E. Herring, Toledo Director of Law, John T. Madigan, General Counsel, and Adam Loukx, Senior Attorney, for appellant.

---

Skow, Judge.

{¶ 1} Appellant, the city of Toledo, appeals from a judgment by the Lucas County Court of Common Pleas granting summary judgment in favor of appellee American Financial Services Association ("AFSA") and appellee intervenor, the state of Ohio. For the reasons that follow, we reverse.

{¶ 2} The instant appeal arises from a complaint filed by AFSA seeking injunctive relief and declaratory judgment in connection with a series of ordinances enacted by the city to regulate predatory lending practices in Toledo. The ordinances were issued after extensive investigation by the city revealed that predatory mortgage lending had become a significant problem in the city and that legislation was needed to address it.

{¶ 3} The city's multisource investigation brought to light the following facts regarding predatory lending. In general, predatory loans are loans made to consumers that are unsuitable to the consumers' particular financial situation. Although there is no single, narrow definition of predatory lending, it characteristically involves the use of fraud or deception, manipulation of the borrower through aggressive sales tactics, or taking unfair advantage of a borrower's lack of understanding of loan terms. It is almost certainly no coincidence that another characteristic of predatory lending is that it occurs most frequently in the subprime market, which is subject to less stringent regulation than the prime market. Of greatest concern to those attempting to stem these offensive practices is the fact that predatory lenders selectively target and victimize society's most vulnerable populations, including the elderly, disabled, and poor.

{¶ 4} A report on predatory lending by the Housing and Urban Development Department and the United States Treasury Department identifies four broad categories of frequent subprime market abuses and describes them as follows:

{¶ 5} (1) Loan Flipping—Loan flipping occurs when a mortgage originator repeatedly refinances a borrower's loan in a short period of time. With each refinancing, the originator charges high fees, including, sometimes, prepayment penalties, that strip the borrower's equity in his home.

{¶ 6} (2) Excessive Fees and "Packing"—Excessive fees are fees that far exceed what would be expected or justified based on economic grounds. "Packing" refers to packing fees into the loan amount without the borrower's understanding.

{¶ 7} (3) Lending without Regard to the Borrowers' Ability to Repay—This practice involves lending based on a borrower's equity in his home, when the borrower clearly does not have the capacity to repay the loan. In particularly egregious cases, elderly people living on fixed incomes end up with monthly payments that equal or exceed their monthly incomes. Such loans quickly lead borrowers into default and foreclosure.

{¶ 8} (4) Outright Fraud and Abuse—As indicated above, unscrupulous lenders commit fraud and abuse against certain vulnerable groups, including the elderly, disabled, and individuals with lower incomes and less education, by using deceptive or high-pressure sales tactics.

{¶ 9} Existing consumer protection laws have been largely unsuccessful in curbing the abusive practices. In fact, predatory lending has been allowed to flourish, even after the passage of the federal Home Ownership and Equity Protection Act of 1994 ("HOEPA"), as evidenced by a dramatic increase in foreclosures in Lucas County. The negative effects of predatory lending affect more than just the victimized borrowers. Homes that have been foreclosed upon can depress property values and lead to neighborhood deterioration and disinvestment and loss of taxes. According to the Coalition for Responsible Lending, predatory lending has cost borrowers in the United States approximately $9.1 billion annually.

{¶ 10} In response to these problems, the Toledo City Council passed the first of three ordinances addressing the subject of predatory lending on November 5, 2002. The legislative intent of the law, as set forth in the ordinance itself, is as follows:

{¶ 11} "Abusive and unfair lending practices adversely affect the City of Toledo and its residents, especially the poor and the elderly. Such practices may include aggressive and targeted marketing technologies, the making of loans exceeding a person's ability to pay, the changing [sic] of inflated fees and interest and the use

of inflated appraisals. The purpose of this ordinance is to address such abusive lending practices not covered completed [sic] by state or federal law."

{¶ 12} The city's predatory-lending legislation specifically targets high-cost residential mortgage loans and seeks to eliminate deceptive practices frequently associated with these transactions. Primarily, the law requires that borrowers be provided with certain disclosures regarding the terms of their loan agreements. In addition, the law contains prohibitions against certain dishonest and unethical acts or practices on the part of lenders.

{¶ 13} The first predatory-lending ordinance to be enacted by the city was Ordinance No. 291–02, which was passed in November 2002. Subsequent versions of the predatory-lending ordinance, Ordinance Nos. 271–03 and 765–03, were enacted in July 2003 and October 2003, respectively. The first amended ordinance limited the law's application to lenders who originate home loans and clarified that the law applied only to mortgage loans on residential property located in Toledo. The second amended ordinance limited the applicability of the various disclosure requirements to mortgage loans having certain features, as listed in the ordinance.

{¶ 14} On February 4, 2003, AFSA filed its initial complaint stating that Ordinance No. 291–02 was a violation of Ohio Home Rule Law. On April 2, 2003, the state of Ohio filed a motion to intervene claiming that the city was challenging the constitutionality of the state's predatory-lending statute.

{¶ 15} On August 5, 2003, soon after the enactment of the first amended city ordinance, AFSA filed its first amended complaint. The state's motion to intervene was granted on August 6.

{¶ 16} On November 6, 2003, soon after the enactment of the second amended city ordinance, AFSA filed its second amended complaint.

{¶ 17} The state filed a motion for summary judgment on November 20, 2003, and AFSA filed a motion for summary judgment on November 21, 2003. On July 21, 2004, the trial court issued a judgment entry granting both motions for summary judgment on the grounds that the state's predatory-lending law, set forth in 2002 Am.Sub.H.B. No. 386, preempted the city predatory-lending ordinances.

{¶ 18} The city timely filed an appeal of the trial court's judgment.

{¶ 19} The city raises the following assignments of error:

{¶ 20} Assignment of Error I: "Trial court erred when it granted summary judgment on behalf of the appellees by determining that H.B. 386 preempted Toledo's predatory lending ordinances."

{¶ 21} Assignment of Error II: "The trial court erred in finding the [sic] Toledo's predatory lending ordinances were not severable if only certain provisions were invalid."

## FIRST ASSIGNMENT OF ERROR

{¶ 22} The city argues in its first assignment of error that the trial court erred in granting summary judgment in favor of appellees.

### Summary–Judgment Standard

{¶ 23} An appellate court reviewing a trial court's granting of summary judgment does so de novo, applying the same standard used by the trial court. *Grafton v. Ohio Edison Co.* (1996), 77 Ohio St.3d 102, 105, 671 N.E.2d 241. Civ.R. 56(C) provides:

{¶ 24} "Summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. No evidence or stipulation may be considered except as considered in this rule."

{¶ 25} Summary judgment is proper when (1) no genuine issue of material fact remains to be litigated, (2) the moving party is entitled to judgment as a matter of law, and (3) when the evidence is viewed most strongly in favor of the nonmoving party, reasonable minds can come to but one conclusion, a conclusion adverse to the nonmoving party. *Ryberg v. Allstate Ins. Co.* (July 12, 2001), 10th Dist. No. 00AP–1243, 2001 WL 777121, citing *Tokles & Son, Inc. v. Midwestern Indemn. Co.* (1992), 65 Ohio St.3d 621, 629, 605 N.E.2d 936.

{¶ 26} The moving party bears the initial burden of informing the trial court of the basis for the motion and identifying those portions of the record that demonstrate the absence of a genuine issue of fact as to an essential element of one or more of the nonmoving party's claims. *Dresher v. Burt* (1996), 75 Ohio St.3d 280, 292, 662 N.E.2d 264. Once this burden has been satisfied, the nonmoving party has the burden, as set forth at Civ.R. 56(E), to offer specific facts showing a genuine issue for trial. Id.

### H.B. No. 386

{¶ 27} In challenging the summary judgment entry, the city specifically disputes the trial court's conclusion that H.B. No. 386, which enacted the state predatory-lending law, preempts the city predatory-lending law.

{¶ 28} H.B. No. 386, which essentially incorporated the federal Home Owner-ship and Equity Protection Act of 1994 ("HOEPA"), added new sections to the Revised Code (at R.C. 1349.25 to 1349.37 and R.C. 1.63) that addressed predatory lending in Ohio. See *Dayton v. State,* 157 Ohio App.3d 736, 2004-Ohio-3141, 813 N.E.2d 707, at ¶ 2, 4; *Am. Fin. Servs. Assn. v. Cleveland,* 159 Ohio App.3d 489, 2004-Ohio-6416, 824 N.E.2d 553, at ¶ 7. Like the Toledo ordinances, HOEPA and H.B. No. 386 use various disclosure requirements and prohibitions to protect the public in connection with high-cost mortgage loans. See *Dayton* at ¶ 2, 3. Unlike the Toledo ordinances, HOEPA and H.B. No. 386 list certain trigger rates below which the statutes do not apply. As a result, certain loans not meeting the state's trigger rates are left unregulated by state law but are regulated under Toledo's ordinances.[1] H.B. No. 386 additionally provides for state preemption in connec-tion with the regulation of loans. In creating the provisions set forth in R.C. 1.63, the General Assembly specifically attempts to restrict municipal power by precluding municipal regulation in the areas of the origination, granting, servic-ing, or collection of loans.[2] See *Dayton* at ¶ 86.

---

**1.** {¶ a} Ohio's predatory-lending law covers loans that (1) involve property located in Ohio and (2) are considered "mortgages" under Section 152(a) of HOEPA, Section 1602(aa), Title 15, U.S.Code, as amended, and the regulations adopted thereunder by the federal reserve board, as amended. R.C. 1349.25(D).

{¶ b} Section 1602(aa), Title 15, U.S.Code defines a "mortgage" as:

{¶ c} "(1) * * * a consumer credit transaction that is secured by the consumer's principal dwelling, other than a residential mortgage transaction, a reverse mortgage transaction, or a transaction under an open end credit plan, if—

{¶ d} "(A) the annual percentage rate at consummation of the transaction will exceed by more than 10 percentage points the yield on Treasury securities having comparable periods of maturity on the fifteenth day of the month immediately preceding the month in which the application for the extension of credit is received by the creditor; or

{¶ e} "(B) the total points and fees payable by the consumer at or before closing will exceed the greater of—

{¶ f} "(i) 8 percent of the total loan amount; or

{¶ g} "(ii) $ 400."

**2.** {¶ a} R.C. 1.63 relevantly provides:

{¶ b} "(A) The state solely shall regulate the business of originating, granting, servicing, and collecting loans and other forms of credit in the state and the manner in which any such business is conducted, and this regulation shall be in lieu of all other regulation of such activities by any municipal corporation or other political subdivision.

{¶ c} "(B) Any ordinance, resolution, regulation, or other action by a municipal corporation or other political subdivision to regulate, directly or indirectly, the origination, granting, servicing, or collection of loans or other forms of credit constitutes a conflict with the Revised Code, including, but not limited to, Titles XI [11], XIII [13], XVII [17], and XLVII [47], and with the uniform operation throughout the state of lending and other credit provisions, and is preempted.

{¶ d} "(C) Any ordinance, resolution, regulation, or other action by a municipal corporation or other political subdivision constitutes a conflict with the Revised Code, including, but not limited to, Titles XI [11], XIII [13], XVII [17], and XLVII [47], and is pre-empted, if the ordinance, resolution, regulation, or other action does either of the following:

### Home–Rule Analysis

■ {¶ 29} Under Section 3, Article XVIII, of the Ohio Constitution, the so-called "Home Rule" provision, "[m]unicipalities shall have authority to exercise all powers of local self-government and to adopt and enforce within their limits such local police, sanitary and other similar regulations, as are not in conflict with general laws." In order for a court to determine whether a state statute has preempted a municipal ordinance, it must employ a three-part test: "A state statute takes precedence over a local ordinance when (1) the ordinance is in conflict with the statute, (2) the ordinance is an exercise of the police power, rather than of local self-government, and (3) the statute is a general law." *Canton v. State*, 95 Ohio St.3d 149, 2002-Ohio-2005, 766 N.E.2d 963, at ¶ 9.

### A. Do the Toledo ordinances involve an exercise of police power, rather than local self-government?

{¶ 30} We will initially address the question whether the Toledo ordinances are an exercise of police power or an exercise of local self-government. The test for determining matters of local self-government has been set forth by the Supreme Court of Ohio as follows:

■ {¶ 31} "To determine whether legislation is such as falls within the area of local self-government, the result of such legislation or the result of the proceedings thereunder must be considered. If the result affects only the municipality itself, with no extraterritorial effects, the subject is clearly within the power of local self-government and is a matter for the determination of the municipality. However, if the result is not so confined it becomes a matter for the General Assembly." *Cleveland Elec. Illum. Co. v. Painesville* (1968), 15 Ohio St.2d 125, 129, 44 O.O.2d 121, 239 N.E.2d 75. "[E]ven if there is a matter of local concern involved, if the regulation of the subject matter affects the general public of the state as a whole more than it does the local inhabitants the matter passes from what was a matter for local government to a matter of general state interest." Id.

■ {¶ 32} The city argues that its predatory-lending ordinances are purely matters of local government, with no extraterritorial effects. Appellees argue to the contrary, stating that any lending regulation has an extraterritorial effect

---

{¶ e} "(1) Disqualifies a person, or its subsidiaries or affiliates, from doing business with such municipal corporation or other political subdivision based upon the acts or practices of such person, or its subsidiaries or affiliates, as an originator, grantor, servicer, or collector of loans or other forms of credit;

{¶ f} "(2) Imposes reporting requirements or other obligations upon a person, or its subsidiaries or affiliates, based upon such person's, or its subsidiaries' or affiliates', acts or practices as an originator, grantor, servicer, or collector of loans or other forms of credit."

because lending is a commercial activity that takes place within an integrated statewide and nationwide structure. Appellees further state that the application and enforcement of a uniform state law better serves the interests of all borrowers in Ohio. The trial court, relying on the decisions of other courts regarding the predatory-lending ordinances of other municipalities, and apparently accepting the arguments of appellees, found the city's predatory-lending ordinances to constitute a police regulation.

{¶ 33} Although it would appear that the narrowly tailored and specifically aimed city ordinances principally affect only Toledo citizens, because it cannot be seriously disputed that the regulation of predatory lending affects the general public of the state more than it does the local inhabitants, the matter necessarily passes from a matter for local government to a matter of general state interest. See *Cleveland Elec. Illum. Co.*, 15 Ohio St.2d at 129, 44 O.O.2d 121, 239 N.E.2d 75. We therefore find that the regulation of predatory lending involves the exercise of police powers, rather than the exercise of local self-government. The first prong of the test to determine whether the state law has preempted the city ordinances has thus been established.

### B. Are the state lending laws general laws?

{¶ 34} Looking to the second prong of the preemption test, we must determine whether the state predatory-lending laws are general laws. As the Supreme Court of Ohio has recently stated, "[T]o constitute a general law for purposes of home-rule analysis, a statute must (1) be part of a statewide and comprehensive legislative enactment, (2) apply to all parts of the state alike and operate uniformly throughout the state, (3) set forth police, sanitary, or similar regulations, rather than purport only to grant or limit legislative power of a municipal corporation to set forth police, sanitary, or similar regulations, and (4) prescribe a rule of conduct upon citizens generally." *Canton v. State*, 95 Ohio St.3d 149, 2002-Ohio-2005, 766 N.E.2d 963, at ¶ 21.

{¶ 35} The city argues that H.B. No. 386 "was little more than a transparent attempt by the Legislators in Columbus to circumvent city power," and, therefore, the trial court erred in finding that H.B. No. 386 constituted a general law. In making this argument, the city specifically points to R.C. 1.63, which, as indicated above, was enacted as part of H.B. No. 386 to establish state preemption in the area of regulation of loans and other forms of credit.

### 1. Do the state predatory lending statutes constitute a statewide and comprehensive legislative enactment?

{¶ 36} H.B. No. 386 regulates the terms and disclosures required in mortgage agreements (R.C. 1349.26 and 1349.27), provides the remedy of rescission to

predatory-lending victims (R.C. 1349.29), and authorizes the Superintendent of Financial Institutions to investigate and penalize creditors who violate the law (R.C. 1349.34). In addition, R.C. 1.63 ostensibly ensures that the regulations are uniformly applied and enforced by establishing state preemption of regulation of loans and other forms of credit.

{¶ 37} Although R.C. 1.63, standing alone, presents a clear violation of the Home Rule provision (see discussion infra), the law unequivocally provides that such provision "should not be read and interpreted in isolation" from other relevant portions of the Revised Code. *Clermont Environmental Reclamation Co. v. Wiederhold* (1982), 2 Ohio St.3d 44, 48, 2 OBR 587, 442 N.E.2d 1278. Reading and interpreting the state predatory-lending provisions as a whole, it is our opinion that together they constitute a statewide comprehensive enactment.

> 2. Does the state predatory-lending law apply to all parts of the state alike and operate uniformly throughout the state?

{¶ 38} There is no dispute in this case that the state's predatory-lending statutes regulate all parts of the state alike and operate uniformly throughout the state.

> 3. Does the state predatory lending law set forth police, sanitary, or similar regulations, rather than purporting only to grant or limit legislative power of a municipal corporation to set forth police, sanitary, or similar regulations?

{¶ 39} As indicated above, the state's regulation of predatory-lending practices are an exercise of police power. In addition, upon reading the state predatory-lending provisions as a whole (as we must, pursuant to *Clermont*, supra), we find that the legislation does not solely grant or limit legislative power.

> 4. Does the state predatory-lending law prescribe a rule of conduct upon citizens generally?

{¶ 40} Again, construing all of the statutory lending provisions together, in the context of the overall legislation, it becomes clear that the state predatory-lending law does, in fact, prescribe a rule of conduct upon citizens generally.

{¶ 41} Thus, all of the criteria have been met to establish that the state predatory-lending law is a general law.

C. Do the Toledo ordinances conflict with state predatory-lending law?

{¶ 42} The third, and final, prong of the test to determine whether the state law has preempted the Toledo ordinances requires us to examine whether the Toledo ordinances conflict with the state predatory-lending statutes. The trial court found that the Toledo ordinances impermissibly conflict with state law

because the Toledo ordinances apply to a broader range of loans than is covered by the state law. Thus, a conflict was perceived to exist because the Toledo law in some cases prohibits that which the state law allows. The city argues that this was an improper basis for finding a conflict, and that, contrary to the trial court's conclusion, the city may appropriately choose to provide more stringent protection for its citizens than is provided by the state.

{¶ 43} To determine whether a municipal ordinance conflicts with a general law of the state, "the test is whether the ordinance permits or licenses that which the statute forbids or prohibits, and vice versa." *Struthers v. Sokol* (1923), 108 Ohio St. 263, 140 N.E. 519, at paragraph two of the syllabus; see, also, *Middleburg Hts. v. Ohio Bd. of Bldg. Stds.* (1992), 65 Ohio St.3d 510, 605 N.E.2d 66; *Fondessy Enterprises, Inc. v. Oregon* (1986), 23 Ohio St.3d 213, 23 OBR 372, 492 N.E.2d 797; *Lorain v. Tomasic* (1979), 59 Ohio St.2d 1, 13 O.O.3d 1, 391 N.E.2d 726. Further, "[a] police ordinance is not in conflict with a general law upon the same subject merely because certain specific acts are declared unlawful by the ordinance, which acts are not referred to in the general law, or because certain specific acts are omitted in the ordinance but referred to in the general law, or because different penalties are provided for the same acts, even though greater penalties are imposed by the municipal ordinance." *Struthers*, supra, at paragraph three of the syllabus. In addition, the Supreme Court of Ohio has held that in the absence of specific statutory language that limits local regulation, there is no conflict between state rules that provide minimum requirements and local rules that provide for stricter regulation. See *Middleburg Hts. v. Ohio Bd. of Bldg. Stds.*, 65 Ohio St.3d at 513–515, 605 N.E.2d 66. Thus, as long as no conflict is presented, a city may adopt greater protections, requirements, or standards than those of the state. See *Am. Fin. Servs. Assn. v. Cleveland*, 159 Ohio App.3d 489, 2004-Ohio-6416, 824 N.E.2d 553, at 31 (citing *Das v. Ohio State Univ.* (S.D.Ohio2000), 115 F.Supp.2d 885; *Mentor Green Mobile Estates v. Mentor* (Aug. 23, 1991), Lake App. No. 90–L–15–135, 1991 WL 163450; *Fondessy*, supra).

{¶ 44} To the extent that R.C. 1.63 can be read to limit local regulation, and thus to create a conflict by peremptorily prohibiting any type of municipal regulation in the area of predatory lending, we find that it is unconstitutional and invalid as a clear violation of the Home Rule provision. In support of this conclusion, we quote extensively from the Eighth District Court of Appeals' opinion in *Am. Fin. Servs. Assn. v. Cleveland*:

{¶ 45} "The Home Rule Amendment was adopted in 1912. Before that time, municipalities could exercise only those powers delegated by statute. In early decisions concerning the amendment, it was expressed that '[t]he bottom [line] of the "Municipal Home Rule" amendment was to emancipate, to free, the cities and

villages of Ohio from interference, exploitation and ripper legislation by the general assembly of Ohio, and to leave the matter of the government of the cities to the people of the cities.' *State ex rel. Doerfler v. Otis* (1918), 98 Ohio St. 83, 98, 120 N.E. 313, Wanamaker, J., dissenting. It was also stated that '[t]he object of the home-rule amendment was to permit municipalities to use this intimate knowledge and determine for themselves in the exercise of all the powers of local self-government how these and similar local affairs should be conducted.' *Froelich v. Cleveland* (1919), 99 Ohio St. 376, [385] 124 N.E. 212. Later decisions have also recognized that '[t]he purpose of the Home Rule amendments was to put the conduct of municipal affairs in the hands of those who knew the needs of the community best, to-wit, the people of the city.' *N. Ohio Patrolmen's Benevolent Assn. v. Parma* (1980), 61 Ohio St.2d 375, 379, 15 O.O.3d 450, 402 N.E.2d 519, fn. 1.

{¶ 46} "Courts must be mindful of these principles when conducting a home-rule conflict analysis and ' "when it is possible * * * to harmonize the general law and municipal ordinances, the same should be done." ' Id. at 377, 15 O.O.3d 450, 402 N.E.2d 519, quoting *Coshocton v. Saba* (1936), 55 Ohio App. 40, 43, 8 O.O. 345, 8 N.E.2d 572. Clearly, home rule establishes that a 'one size fits all' solution by statewide legislative enactment is not always in the best interests of the people. As Justice Ralph Locher stated in his concurring opinion in *Fondessy* : 'It is my view that the adoption of home rule in Ohio was as important a step in government to this state as the federal Constitution was to the United States as a whole. To disenfranchise communities in the name of expediency and to relegate home rule to the dust bins of benign neglect cannot be countenanced by this court. Today's decision should serve to revivify our constitutional commitment to the people of this state to control their own destinies.' *Fondessy,* 23 Ohio St.3d at 220, 23 OBR 372, 492 N.E.2d 797, Locher, J., concurring." *Am. Fin.* at ¶ 34–35.

{¶ 47} With respect to the remaining state predatory-lending law provisions and their impact on the city ordinances, it is our conclusion that as long as the Toledo ordinances do not expressly permit what the state statutes ·expressly forbid, or vice versa, it is within Toledo's home-rule powers to establish more stringent protection of its citizens than is offered by the state. Cf. *Am. Fin. Servs. Assn. v. Cleveland* (finding that the city of Cleveland's enactment of stricter predatory-lending ordinances was a proper exercise of its home-rule powers); but cf. *Dayton v. State,* 157 Ohio App.3d 736, 2004-Ohio-3141, 813 N.E.2d 707 (finding that because the predatory-lending ordinance enacted by the city of Dayton disallowed certain loans that were allowed under Ohio's Predatory Lending Act, the Dayton ordinance impermissibly conflicted with the state law.)

{¶ 48} AFSA argues that, in fact, express conflicts do exist among the two bodies of legislation, including (1) conflicts between the various penalties set forth in the respective laws, (2) conflicting requirements as to credit insurance, (3) conflicting requirements as to home-improvement loans, and (4) conflicting requirements as to third-party fees.

{¶ 49} We begin with an examination of the alleged conflicts between the various penalties. Toledo Municipal Code ("TMC") 795.23, which deals with penalties under the municipal predatory-lending law, provides that "[w]hoever violates Section 795.21 of the Municipal Code shall be guilty of a minor misdemeanor." Id. at 795.23(a). TMC 795.21 enumerates practices that are prohibited under the ordinance and includes a prohibition against a lender's failure to make any disclosure as required by TMC 795.22.

{¶ 50} R.C. 1349.31, which deals with penalties under the state predatory-lending law, provides that "[n]o creditor shall willfully and knowingly fail to comply with section 1349.26 or 1349.27 of the Revised Code." R.C. 1349.31(A)(1). R.C. 1349.26 involves creditor disclosures concerning covered loans, and R.C. 1349.27 involves prohibited acts under the state law. A creditor who violates those provisions is guilty of a felony of the fifth degree. R.C. 1329.31(A)(2).

{¶ 51} To the extent that a failure to provide disclosures under the city predatory-lending law results in a minor misdemeanor, while a failure to provide disclosures under the state predatory-lending law results in a fifth-degree felony, there would appear to be a conflict. In fact, the Supreme Court of Ohio in *Cleveland v. Betts* (1958), 168 Ohio St. 386, 7 O.O.2d 151, 154 N.E.2d 917, stated that a conflict is created when an act that constitutes a felony under state law is turned into a misdemeanor at the municipal level. Id. at 389, 7 O.O.2d 151, 154 N.E.2d 917. In this case, however, examination of the two bodies of law reveals that the disclosures required, and, thus, the failures to disclose that are sanctionable, are not the same under the municipal and state laws. Because the disclosure requirements of the two laws do not involve the same disclosures, they do not conflict with one another. Since the disclosure requirements do not conflict, there is no conflict between the respective penalties that are associated with them.

{¶ 52} This court does find a direct conflict with respect to penalties for payment to a contractor under a home-improvement contract. The municipal and state laws contain nearly identical provisions in this area. See TMC 795.21 and R.C. 1349.27.

{¶ 53} TMC 795.21(a)(6) provides: "No lender shall knowingly do any of the following: * * * Pay a contractor under a home-improvement or construction contract from the proceeds of a home loan other than (i) by an instrument

payable to the borrower or jointly to the borrower and the contractor, or (ii) at the election of the borrower, through a third-party escrow agent in accordance with terms established in a written agreement signed by the borrower, the lender, and the contractor prior to the disbursement * * *."

{¶ 54} R.C. 1349.27 provides:

{¶ 55} "A creditor shall not do any of the following:

{¶ 56} "* * *

{¶ 57} "(E) Make a payment to a contractor under a home improvement contract from amounts extended as credit under a covered loan, except in either of the following ways:

{¶ 58} "(1) By an instrument that is payable to the consumer or jointly to the consumer and the contractor;

{¶ 59} "(2) At the election of the consumer, by a third party escrow agent in accordance with terms established in a written agreement signed by the consumer, the creditor, and the contractor before the date of payment."

{¶ 60} Under the municipal law, the violation is a minor misdemeanor, and under the state law, it is a fifth-degree felony. Pursuant to *Cleveland v. Betts,* 168 Ohio St. 386, 7 O.O.2d 151, 154 N.E.2d 917, supra, this is an unacceptable conflict.

{¶ 61} We next review AFSA's claim that there are conflicts between the credit-insurance requirements of both laws. The municipal credit-insurance-disclosure requirement, set forth at TMC 795.22(a)(3), provides that a borrower may cancel any purchased credit life, credit disability, or credit unemployment insurance within 30 days of closing. However, the Second Mortgage Loan Act permits borrowers in second-mortgage transactions to cancel credit insurance within 25 days. See R.C. 1321.57(E). Thus, there is a conflict in the two laws to the extent that, in the area of second mortgage loans, city law provides for a cancellation period that is five days longer than that provided by the state.

{¶ 62} AFSA additionally argues that the TMC 795.22(a)(3) disclosure conflicts with state law to the extent that no substantive provision of the state law (or even of the municipal law) precludes a lender from requiring the insurance or authorizes a borrower to cancel it within 30 days of closing. As discussed earlier in this decision, the city is permitted under Home Rule principles to establish more stringent regulation of predatory lending than is provided by the state. Thus, the mere absence of a state-law provision does not evidence a conflict. That there is no substantive municipal rule, but only a disclosure requirement, setting forth this particular regulation may ultimately be a problem for the city, but it does not demonstrate a conflict with state law.

{¶ 63} Next, we will address AFSA's claim that there are conflicting requirements in the area of home-improvement loans. AFSA specifically challenges the validity of TMC 795.22(a)(6), which requires lenders in applicable home-loan transactions to include the following written disclosure:

{¶ 64} "Release of Lender Warning. The purpose of this loan is to pay for a home improvement contract. The lender shall not be liable for any non-performance on the part of the home improvement contractor unless the lender has engaged in an act or practice prohibited by Section 795.21."

{¶ 65} AFSA claims that the municipal disclosure requirement conflicts with provisions of the Ohio Retail Installment Sales Act, which generally provide that when a lender and a seller of goods have a business arrangement by which the lender makes a loan that enables the borrower to purchase goods from the seller, the borrower may assert against the lender any defense that he or she could assert against the seller. See R.C. Chapter 1317. As the city points out, however, there is no actual conflict between the two bodies of legislation; TMC 795.22(a)(6) applies to the nonperformance of a contractor in a home-improvement contract, and the Ohio Retail Installment Act applies to the sale of movable goods. See R.C. 1317.01(C)(1)(a). Again, although there may be problems with the language of the disclosure—even the city acknowledges doubt that the disclosure could actually operate as a limitation of lender liability—there is no recognizable conflict.

{¶ 66} Finally, AFSA claims that there are conflicting requirements in the area of third-party fees. TMC 795.22(a)(8) calls for the following disclosure concerning third-party fees: "This loan contains fees payable to third parties which fees may still be payable by the borrower in the event this loan does not close provided that the lender has not engaged in an act or practice prohibited by Section 795.21." AFSA challenges this provision on the grounds that under Ohio law, lenders generally have the right to enforce agreements by loan applicants to pay third-party costs (such as appraisal fees and charges for surveys and credit reports) regardless of whether the loan closes. See R.C. 1322.08. Once again, we note that Home Rule permits the city to establish stricter regulation of predatory lending than is provided by the state. And, again, we note that because there is no substantive municipal rule, only a disclosure requirement, addressing the issue, this may well be a problem with the municipal law. There is, however, no conflict with state law.

{¶ 67} For all of the foregoing reasons, the city's first assignment of error is found well taken to the extent allowed in this decision and judgment entry.

## SECOND ASSIGNMENT OF ERROR

{¶ 68} The city contends in its second assignment of error that the trial court erred in finding that the city's predatory-lending ordinances were not severable if only certain provisions were invalid.

{¶ 69} As indicated above, we found two areas in which the municipal law impermissibly conflicted with state law: (1) in the area of penalties for improper payment to a contractor under a home improvement contract and (2) in the area of second mortgage loans, where Toledo law provides for a cancellation period that is five days longer than that provided by the state.

{¶ 70} To determine whether the unconstitutional portions of an ordinance may be severed from the ordinance, Ohio employs the following three-part test:

{¶ 71} " ' "(1) Are the constitutional and the unconstitutional parts capable of separation so that each may be read and may stand by itself? (2) Is the unconstitutional part so connected with the general scope of the whole as to make it impossible to give effect to the apparent intention of the Legislature if the clause or part is stricken out? (3) Is the insertion of words or terms necessary in order to separate the constitutional part from the unconstitutional part, and to give effect to the former only?" ' " *Huber Hts. v. Liakos* (2001), 145 Ohio App.3d 35, 49–50, 761 N.E.2d 1083, quoting *State v. Hochhausler* (1996), 76 Ohio St.3d 455, 464–465, 668 N.E.2d 457, quoting *Geiger v. Geiger* (1927), 117 Ohio St. 451, 466, 160 N.E. 28.

{¶ 72} Looking first to the conflict involving the state and municipal penalties for improper payment to a contractor under a home-improvement contract, we find that the unconstitutional municipal provision set forth at TMC 795.21(a)(6) is easily capable of separation from the remainder of the municipal law, so that each may be read and may stand by itself. We further find that the unconstitutional part is not so connected with the general scope of the whole as to make it impossible to give effect to the apparent intention of the legislature if the part is stricken out. Finally, we find that the insertion of words or terms is not necessary to separate the constitutional part from the unconstitutional part and to give effect to the former only. Accordingly, we find that TMC 795.21(a)(6) may properly be severed from the rest of the ordinance.

{¶ 73} We next consider the severability of the municipal credit-insurance disclosure requirement, set forth at TMC 795.22(a)(3). As discussed above, the Toledo law provides for a cancellation period that is five days longer than the 25–day cancellation period provided by the state. Upon examination, we find that this disclosure requirement is easily capable of separation so that each may

be read and may stand by itself. We further find that the unconstitutional part is not so connected with the general scope of the whole as to make it impossible to give effect to the apparent intention of the legislature if the part is stricken out. Lastly, we find that the insertion of words or terms is not necessary in order to separate the constitutional part from the unconstitutional part and to give effect to the former only. Thus, we find that the municipal credit-insurance disclosure requirement set forth at TMC 795.22(a)(3) is properly severed from the rest of the municipal law.

{¶ 74} AFSA makes an additional claim that the private right of action set forth at TMC 795.23 was not within the city's authority to create and is, therefore, invalid. TMC 795.23(c) provides:

{¶ 75} "(1) Notwithstanding the provisions of Section 795.20 through 795.23, any individual who becomes obligated on a loan may bring an action for damages and/or equitable relief in a court of competent jurisdiction against any lender who violates Section 795.21. Judgment shall be entered for actual damages, but in no case less than the amount of home equity the individual has lost as a result of the loan, as determined by the court, rescission of the loan, in accordance with the rescission provisions of the federal Truth in Lending Act, reasonable attorney fees and court costs."

{¶ 76} The Supreme Court of Ohio has held that municipal home-rule authority "does not include the power to regulate the jurisdiction of courts established by the Constitution or by the General Assembly thereunder." *Cupps v. Toledo* (1959), 170 Ohio St. 144, 10 O.O.2d 95, 163 N.E.2d 384, paragraph one of the syllabus. In creating a private right of action and in legislating the type of damages to be awarded pursuant to that right of action, the city acted outside the scope of its home-rule authority by attempting to regulate the jurisdiction of the courts. We therefore find that TMC 795.23(c)(1) is invalid and completely unenforceable.

{¶ 77} Our examination of TMC 795.23(c)(1) reveals that (1) it is capable of separation from the rest of the municipal predatory lending legislation, (2) it is not inextricably intertwined with the general scope of the whole, and (3) it does not require the insertion of words or terms in order to separate the constitutional part from the unconstitutional part and to give effect to the former only. We therefore find that it is capable of severance.

{¶ 78} Finally, we review claims by AFSA that portions of the municipal law are void for vagueness.

{¶ 79} The Supreme Court of Ohio, in *Buckley v. Wilkins*, 105 Ohio St.3d 350, 2005-Ohio-2166, 826 N.E.2d 811, recently set forth the following guidelines for determining whether a law is unconstitutionally vague:

{¶ 80} " 'The due process clause of the Constitution provides the foundation for the void for vagueness doctrine.' *Columbia Natural Resources, Inc. v. Tatum* (C.A.6, 1995), 58 F.3d 1101, 1104. Laws must 'give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly,' and laws must also 'provide explicit standards' for the police officers, judges, and jurors who enforce and apply them. *Grayned v. Rockford* (1972), 408 U.S. 104, 108–109, 92 S.Ct. 2294, 33 L.Ed.2d 222.

{¶ 81} "In weighing the appellants' constitutional challenge to R.C. 5747.01, we must of course adhere to the oft-stated rule that a court's power to invalidate a statute 'is a power to be exercised only with great caution and in the clearest of cases.' *Yajnik v. Akron Dept. of Health, Hous. Div.*, 101 Ohio St.3d 106, 2004-Ohio-357, 802 N.E.2d 632, ¶ 16. Laws are entitled to a 'strong presumption of constitutionality,' and any party challenging the constitutionality of a law 'bears the burden of proving that the law is unconstitutional beyond a reasonable doubt.' Id.

{¶ 82} "The void-for-vagueness doctrine 'does not require statutes to be drafted with scientific precision.' *Perez v. Cleveland* (1997), 78 Ohio St.3d 376, 378, 678 N.E.2d 537. Rather, 'it permits a statute's certainty to be ascertained by application of commonly accepted tools of judicial construction, with courts indulging every reasonable interpretation in favor of finding the statute constitutional.' Id., 78 Ohio St.3d at 378–379, 678 N.E.2d 537. The bar is not a high one, and a 'civil statute that is not concerned with the First Amendment is only unconstitutionally vague if it is " 'so vague and indefinite as really to be no rule [or standard] at all' or if it is 'substantially incomprehensible.' " ' *Chavez v. Hous. Auth. of El Paso* (C.A.5, 1992), 973 F.2d 1245, 1249, quoting *United States v. Clinical Leasing Servs., Inc.* (C.A.5, 1991), 925 F.2d 120, 122, fn. 2, quoting *A.B. Small Co. v. Am. Sugar Refining Co.* (1925), 267 U.S. 233, 239, 45 S.Ct. 295, 69 L.Ed. 589, and *Exxon Corp. v. Busbee* (C.A.5, 1981), 644 F.2d 1030, 1033. The fact that ' "the fertile 'legal imagination can conjure up hypothetical cases in which the meaning' " of disputed terms could be questioned does not render the provision unconstitutionally vague.' *Hutchins v. Dist. of Columbia* (C.A.D.C. 1999), 188 F.3d 531, 546, quoting *Terry v. Reno* (C.A.D.C.1996), 101 F.3d 1412, quoting *Grayned*, 408 U.S. at 110, 92 S.Ct. 2294, 33 L.Ed.2d 222, fn. 15, quoting *Am. Communications Assn. v. Douds* (1950), 339 U.S. 382, 412, 70 S.Ct. 674, 94 L.Ed. 925." *Buckley*, 105 Ohio St.3d 350, 2005-Ohio-2166, 826 N.E.2d 811, ¶ 17–19.

{¶ 83} The first provision that AFSA challenges as unconstitutionally vague is TMC 795.21(a)(3), which prohibits a lender from requesting a borrower to sign an "inaccurate or incomplete home loan document." AFSA argues that

the problem with the provision is that it fails to define the terms "inaccurate" and "incomplete." In our opinion, such language is not unconstitutionally vague; it is neither "so vague and indefinite as really to be no rule at all," nor is it "substantially incomprehensible." See *Chavez*, 973 F.2d at 1249. AFSA's argument to the contrary is therefore rejected.

{¶ 84} AFSA next challenges the validity of TMC 795.21(a)(7), which prohibits lenders from "steer[ing] a borrower to a loan product materially detrimental to the interests of the borrower." As noted by AFSA, the city's predatory-lending law lacks any definition of "steer[ing]" and, further, offers no guidance as to what might be considered "materially detrimental." As a result, the municipal provision fails to "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act according-ly." See *Grayned*, 408 U.S. at 108–109, 92 S.Ct. 2294, 33 L.Ed.2d 222. In addition, the municipal provision fails to " 'provide explicit standards' for the police officers, judges, and jurors who enforce and apply them." *Buckley*, at ¶ 17. We therefore conclude that TMC 795.21(a)(7) is unconstitutionally vague.

{¶ 85} Applying the three-part test for severability, as set forth in *Huber Hts.*, 145 Ohio App.3d at 49–50, 761 N.E.2d 1083, we find that TMC 795.21(a)(7) is severable from the remainder of the municipal law, (1) it is capable of being separated without destroying the ability of either it or the remaining part to stand by itself, (2) it is not inextricably intertwined with the general scope of the whole, and (3) it is not necessary to insert words or terms in order to separate the constitutional part from the unconstitutional part, and to give effect to the former only.

{¶ 86} AFSA also challenges the constitutionality of the credit-insurance disclosure that is set forth in TMC 795.22(a)(3). According to AFSA, the TMC 795.22(a)(3) disclosure is geared only to prepaid single-premium credit insurance (in which the borrower pays an up-front premium on the entire loan amount, which is fully disbursed in a single disbursement at the time the loan is closed). AFSA complains that the disclosure is unworkable as boilerplate because the prepaid single-premium credit insurance is not the only type of credit insurance, and, further, not all home loans are single-disbursement transactions. AFSA fails to recognize, however, that the disclosures set forth in TMC 795.22 are to be provided only "where applicable." TMC 795.22(a). If the credit insurance is of a type that is not covered by the disclosure, it is necessarily inapplicable and would not need to be provided. The disclosure requirement of TMC 795.22(a)(3) is not unconstitutionally vague, as it is neither "so vague and indefinite as really to be no rule at all," nor is it "substantially incomprehensible." See *Chavez*, 973 F.2d at 1249. AFSA's assertion to the contrary is therefore rejected.

{¶ 87} The final provision that AFSA challenges as void for vagueness is the disclosure required by TMC 795.22(a)(9). That disclosure provides: "If you do not understand any part of this disclosure or any of the terms of your home loan, please seek mortgage counseling prior to your date of closing. Your lender can supply a current list of mortgage counseling agencies approved by the City of Toledo to be developed by the Department of Economic and Community Development." TMC 795.22(a)(9). AFSA specifically points to the fact that there is no substantive requirement in the Toledo Municipal Code that Toledo (or its Department of Economic and Community Development) provide such a list to lenders, nor is there any provision specifying which agency of the city will approve such a list. Although we see no problem with requiring a disclosure advising the borrower to seek mortgage counseling, we agree with AFSA that the provision referring to the list of mortgage-counseling agencies is unconstitutionally vague to the extent that it could enable "arbitrary and discriminatory enforcement" of the law. See *Grayned,* 408 U.S. at 108, 92 S.Ct. 2294, 33 L.Ed.2d 222. That is, the city could force lenders, either selectively or generally, to suspend lending or to risk noncompliance with the municipal law by the city's own failure to prepare, approve or update such a list, by arbitrarily changing such a list, or by withholding the list from lenders.

{¶ 88} Applying *Huber Hts.,* we find that the sentence in TMC 795.22(a)(9) referring to the list of mortgage-counseling agencies is easily severable: It can be removed, without adding any additional terms and without affecting the meaning or effectiveness of the remaining portion of the law. See id.

{¶ 89} For all of the foregoing reasons, we find appellant's second assignment of error well taken.

{¶ 90} For the foregoing reasons, we reverse the judgment of the trial court and remand the matter to the Lucas County Court of Common Pleas for further proceedings consistent with this decision. Pursuant to App.R. 24, costs are assessed to the appellees. Upon consideration, the court finds that the judgment in this case is in conflict with the judgment rendered by the Second District Court of Appeals in *Dayton v. State,* 157 Ohio App.3d 736, 2004-Ohio-3141, 813 N.E.2d 707, with respect to the question whether municipal predatory-lending law conflicts with state predatory-lending law when the municipal law would prohibit conduct that the state law would allow. Accordingly, we certify the conflict pursuant to Section 3(B)(4), Article IV, Ohio Constitution. The parties are advised to consult Sup.Ct.Prac.R. IV for guidance on how to proceed.

Judgment reversed.

SINGER, P.J., and HANDWORK, J., concur.